UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| TRIAXX PRIME CDO 2006-1 LTD., TRIAXX PRIME CDO 2006-2, LTD., TRIAXX PRIME CDO 2007-1, LTD., and TRIAXX ASSET MANAGEMENT LLC, <br><br>                  Plaintiffs, <br><br>              -against- <br><br> U.S. BANK NATIONAL ASSOCIATION, <br><br>                 Defendant. | 21 Civ. 11019 <br><br> **COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

OLSHAN FROME WOLOSKY LLP
John G. Moon
Kerrin T. Klein
1325 Avenue of the Americas
New York, New York 10019
(212) 451-2300
*Attorneys for Plaintiffs Triaxx Prime CDO 2006-1 Ltd.,
Triaxx Prime CDO 2006-2, Ltd., Triaxx Prime CDO
2007-1, Ltd., and Triaxx Asset Management LLC*

6175651-1

Table of Contents

Page

INTRODUCTION ...........................................................................................................................1

THE PARTIES................................................................................................................................4

FACTS AT ISSUE.........................................................................................................................5

    A.    The CDOs' Governing Agreements........................................................................5

    B.    U.S. Bank's Conflicts of Interest ..........................................................................10

        1.    U.S. Bank Was Inherently Conflicted Because it Faced Liability
            for its Own Wrongful Servicing Activities, Which Liability it Did
            Not Wish to Concede ..................................................................................10

        2.    Acknowledging Servicing Failures Would have Exposed U.S.
            Bank to Liability as Trustee for Other Securitizations .............................12

        3.    U.S. Bank Also Originated Defective Loans ..............................................13

        4.    U.S Bank was Economically Beholden to the Mortgage Loan
            Sellers.........................................................................................................13

    C.    U.S. Bank's Interference with the Triaxx CDOs' and Collateral Manager's
        Underlying Actions and Attempts to Secure the Collateral...................................14

        1.    The 2016 U.S. Bank Action.......................................................................15

        2.    The Ocwen Action .....................................................................................17

        3.    The HSBC Action......................................................................................18

        4.    Servicer Demands ......................................................................................19

        5.    U.S. Bank Breached its Duties as CDO Trustee in Failing to
            Neutrally Represent All Noteholders and the Collateral Manager in
            Efforts to Preserve the Three-Year Defaulted Securities...........................30

    D.    The Instant Demand to Assign or Pursue Claims .................................................31

    E.    The Results of U.S. Bank's Conflict of Interest ...................................................32

FIRST CLAIM FOR RELIEF (Breach of Contract) ...................................................................34

SECOND CLAIM FOR RELIEF (Negligence / Failure to Avoid Conflicts of Interest).............35

i

Plaintiffs Triaxx Prime CDO 2006-1 Ltd., Triaxx Prime CDO 2006-2, Ltd., Triaxx Prime CDO 2007-1, Ltd. (collectively, the "Triaxx CDOs"), and Triaxx Asset Management LLC (the "Collateral Manager," and together with the Triaxx CDOs, the "Plaintiffs"), by their attorneys Olshan Frome Wolosky LLP, allege against defendant U.S. Bank National Association ("U.S. Bank" or "Defendant"), as follows:

## INTRODUCTION

1.      This case involves U.S. Bank's ongoing unlawful conduct while acting as conflicted trustee to the Triaxx CDOs (in such capacity, the "CDO Trustee").  As CDO Trustee, U.S. Bank owed the Plaintiffs an express duty to act for the benefit of the CDO investors.  U.S. Bank breached its contractual obligations and failed to avoid its irreconcilable conflicts of interest and pursue, or assign authority to the Plaintiffs to pursue, claims against certain residential mortgage-backed securities ("RMBS") trustees and servicers for their breaches of contractual and extra-contractual duties with respect to the underlying RMBS trusts held by the Triaxx CDOs (the "Triaxx-Owned Trusts").

2.      Defendant's conflicts of interest are indisputable.  Primarily, U.S. Bank is serving simultaneously as both trustee of the Triaxx CDOs and as trustee of several of the Triaxx-Owned Trusts.  U.S. Bank has refused, and continues to refuse, to pursue or assign its authority to pursue the Triaxx CDOs' claims to their Collateral Manager or back to the Triaxx CDOs themselves, so that valuable claims can be enforced on behalf of Triaxx CDOs and their Noteholders, including claims against U.S. Bank itself as trustee of a number of the Triaxx-Owned Trusts.  Moreover, U.S. Bank has obstructed the Triaxx CDOs from pursuing actions against the trustees and servicers of Triaxx-Owned Trusts that have harmed the Triaxx CDOs.  This pattern and practice of inaction and obstruction has been perpetuated by U.S. Bank for a very simple reason—U.S. Bank has failed to act in its role as RMBS trustee to protect investors of the Triaxx-

6175651-1

Owned Trusts from losses associated with the 2008 global mortgage crisis, and pursuit of the Triaxx CDOs' claims would expose it to direct and indirect liability.

3.     U.S. Bank's refusal to assign claims and its obstruction of the enforcement of same violate its written agreements with, and extra-contractual duties to, the Triaxx CDOs and the Collateral Manager.  U.S. Bank's unlawful actions have caused damages to the Triaxx CDOs of over $100 million.

4.     In 2006 and 2007, the Triaxx CDOs purchased 144 RMBS having a notional value of approximately $11.74 billion and issued notes (the "CDO Notes") to investors (the "CDO Noteholders") backed by the collateral comprising the RMBS (the "Collateral").  In turn, the RMBS were collateralized by residential mortgage loans.  As has been well documented in numerous government investigations and enforcement actions, civil lawsuits and bankruptcies, many of the loans collateralizing RMBS in the years leading up to the global financial crisis of 2008 were not accurately represented and/or were not properly serviced, and the trustees and servicers of those RMBS failed to perform their contractual and extra-contractual duties for the benefit of the RMBS noteholders, including the Triaxx CDOs.  As a result, the Triaxx CDO's positions in the Triaxx-Owned Trusts suffered, and are expected to suffer, losses of over $100 million, which could have been avoided or mitigated if U.S. Bank had honored, rather than breached, its contractual and extra-contractual duties as CDO Trustee.

5.     In addition to serving as CDO Trustee for each of the Triaxx CDOs, U.S. Bank serves as trustee for certain of the Triaxx-Owned Trusts (in such capacity, the "RMBS Trustee").  U.S. Bank, as CDO Trustee, has obstructed the enforcement of, and refused to bring or assign authority to bring, claims against itself as RMBS Trustee, as well as others similarly situated, despite this unequivocal conflict of interest.

6175651-1

6. Plaintiffs have initiated several actions, proceedings and pre-litigation demands against the trustees and servicers of various Triaxx-Owned Trusts to recover damages resulting from the trustees' and servicers' failures to perform their obligations with respect to the related RMBS (the "Actions"). U.S. Bank, as CDO Trustee, fought to prevent the Triaxx CDOs from bringing or pursuing the Actions on the grounds that, pursuant to the governing agreements, only the CDO Trustee had standing to pursue such claims (including against itself in its capacity as RMBS Trustee). Additionally, U.S. Bank erected numerous hurdles and demanded unreasonable compensation and indemnity protections for itself in connection with pursuing servicer breaches.

7. In 2018, the United States Court of Appeals for the Second Circuit affirmed a District Court decision dismissing one such action against U.S. Bank as RMBS Trustee, holding that the governing agreements vest only the CDO Trustee with standing to sue the trustees of the underlying RMBS. *See Triaxx Prime CDO 2006-1, Ltd. v U.S. Bank N.A.*, 741 F. App'x 857 (2d Cir. 2018). In 2019, the Eleventh Circuit reached a similar conclusion with respect to claims against servicers. *See Triaxx Prime CDO 2006-1, Ltd. v Ocwen Loan Servicing, LLC*, 762 F. App'x 601 (11th Cir. 2019). These decisions effectively hold that only U.S. Bank, as CDO Trustee, can bring or assign the right to bring claims on behalf of the Triaxx CDOs and their Noteholders against U.S. Bank, as RMBS Trustee, and against other RMBS trustees or servicers.

8. Under the agreements governing the Triaxx CDOs, U.S. Bank is required to act in the best interests of the CDO Noteholders. Such agreements further authorize the Collateral Manager (on behalf of the Triaxx CDOs) to direct U.S. Bank to take actions in the best interest of the CDO Noteholders.

6175651-1

9. Due to U.S. Bank's indisputable conflicts of interest, resulting in U.S. Bank's failure and/or refusal to pursue the Actions, the Triaxx CDOs and their Collateral Manager directed U.S. Bank, in its capacity as CDO Trustee, to assign its authority to pursue the Actions and any related claims to either the Triaxx CDOs or to the Collateral Manager. U.S. Bank refused to follow that direction.

10. Plaintiffs now assert claims against U.S. Bank as CDO Trustee for, *inter alia*: (1) breaching its contractual duty to secure the rights and remedies of the Plaintiffs and the CDO Noteholders and to take actions in the best interest of the Plaintiffs and the CDO Noteholders and (2) breaching its extra-contractual duty to avoid its irreconcilable conflicts of interest.

## THE PARTIES

11. The Triaxx CDOs are all corporations, referred to as exempt companies, incorporated under the laws of the Cayman Islands, with their principal places of business located at Walker House, 87 Mary Street, George Town, Grand Cayman KY1-9002. The Triaxx CDOs are citizens of the Cayman Islands for purposes of 28 U.S.C. § 1332(a).

12. The Collateral Manager is a limited liability company organized and existing under the laws of the State of Delaware. The Collateral Manager is a citizen of New York State for purposes of 28 U.S.C. § 1332(a): its sole member is Triaxx Holdco LLC, whose members are United States citizens domiciled in New York.

13. U.S. Bank is a national banking association with its registered main office located in Cincinnati, Ohio. U.S. Bank is a citizen of Ohio for purposes of 28 U.S.C. § 1332(a).

14. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) because it is an action between citizens of different States and citizens of a foreign state (Cayman Islands).

4

6175651-1

15. This Court also has subject matter jurisdiction over this action pursuant to 12 U.S.C. § 632 because a corporation organized under the law of the United States is a party to this action, and this action arises out of transactions involving international and foreign financial operations.

16. This Court has personal jurisdiction over U.S. Bank because it systematically conducts business in the State of New York, and pursuant to Section 14.11 of the Indentures (as defined below), which provides that the CDO Trustee "irrevocably submit[s] to the non-exclusive jurisdiction of any New York State or Federal court sitting in the Borough of Manhattan in the City of New York in any action or proceeding arising out of or relating to the Senior Notes or this Indenture."

17. Venue in this Court is proper pursuant to 28 U.S.C. § 1391 because U.S. Bank has a substantial presence in this District, a substantial part of the events or omissions giving rise to the claim in this action occurred in this District, and U.S. Bank is subject to personal jurisdiction in this District.

## FACTS AT ISSUE

### A. The CDOs' Governing Agreements

18. In 2006 and 2007, the Triaxx CDOs purchased the Triaxx-Owned Trusts. To allow investors to participate in the income generated by those RMBS, the Triaxx CDOs issued the CDO Notes to the CDO Noteholders backed by the Collateral.

19. To issue the CDO Notes, the Triaxx CDOs entered into three indentures (the "Indentures") with, among others, LaSalle Bank, N.A. as trustee. U.S. Bank succeeded to the rights and obligations of LaSalle Bank, N.A. under the Indentures well before the events at issue in this litigation.

5

6175651-1

20.    Simultaneously with the execution of the Indentures, the Triaxx CDOs entered into three Collateral Management Agreements (the "CMAs") with ICP Asset Management LLC (the former name of the current Collateral Manager, Triaxx Asset Management LLC).

21.    The three CMAs and the three Indentures[1] (together, the "Agreements") were executed in pairs as part of three unified transactions.  Each pair was executed on the same date, with the CMA incorporating its corresponding Indenture by reference, and with the Indenture becoming effective upon delivery of its corresponding CMA.  CMA § 1; Indenture § 3.1(g).

22.    The Agreements are as follows:

    a.    Collateral Management Agreement between Triaxx Prime CDO 2006-1, Ltd., as issuer, and the Collateral Manager, dated September 7, 2006;

    b.    Indenture between Triaxx Prime CDO 2006-1, Ltd., as issuer, Triaxx Prime CDO 2006-1, LLC, as co-issuer, and the CDO Trustee, dated September 7, 2006;

    c.    Collateral Management Agreement between Triaxx Prime CDO 2006-2, Ltd., as issuer, and the Collateral Manager, dated December 14, 2006;

    d.    Indenture between Triaxx Prime CDO 2006-2, Ltd., as issuer, Triaxx Prime CDO 2006-2, LLC, as co-issuer, and the CDO Trustee, dated December 14, 2006;

---

[1] Each of the CMAs and each of the Indentures are identical in all material respects.  Therefore, for ease of reference, all citations to the CMAs and the Indentures are to the CMA and Indenture forming Triaxx Prime CDO 2006-1 Ltd.

6175651-1

  e. Collateral Management Agreement between Triaxx Prime CDO 2007-1, Ltd., as issuer, and the Collateral Manager, dated March 29, 2007; and

  f. Indenture between Triaxx Prime CDO 2007-1, Ltd., as issuer, Triaxx Prime CDO 2007-1, LLC, as co-issuer, and the CDO Trustee, dated March 29, 2007.

23. The Agreements define the rights and responsibilities over the Collateral. The Issuers (the Triaxx CDOs) are responsible for the Collateral: they must not sell or otherwise dispose of Collateral except as permitted under Article XII and Section 7.8 of the Indentures and must "enforce any of the Pledged Securities or other instruments or property included in the Collateral" under Section 7.5.  Indenture §§ 7.5, 7.8, 12.1.

24. The Agreements also define the obligations of the CDO Trustee.  For example, the CDO Trustee must act in the best interest of the CDO Noteholders to "protect the Trustee's interest in the Collateral held for the benefit and security of the Secured Parties." Indenture Granting Clauses.

25. The CDO Trustee also has a duty to take such action as may be necessary or desirable to secure the Collateral.  Section 7.5 of the Indentures requires the "Issuer (or the [CDO] Trustee on behalf of the Issuer) . . . [to] take such other action as may be necessary or advisable or desirable to secure the rights and remedies of the Secured Parties hereunder and to . . . (iv) enforce any of the Pledged Securities or other instruments or property included in the Collateral."

26. The Collateral Manager, who under the Agreements is responsible for day-to-day management of the Collateral, has significant power to direct the CDO Trustee to take

7

6175651-1

action in the best interest of the CDO Noteholders.  For example, Section 2(a) of the CMA provides that the Collateral Manager performs "on behalf of the Issuer (or direct[s] the performance of) those duties and functions assigned to the Issuer or the Collateral Manager in the Indenture . . . ." CMA § 2(a); Indenture §§ 7.17(f), 10.9(a), 12.1(b), 12.4(a) (each providing that "the Collateral Manager, on behalf of the Issuer, shall" act).

27.    The Collateral Manager may also "take on behalf of the Issuer or direct the Trustee to take [various enumerated] actions with respect to a Collateral Debt Security, an Equity Security or an Eligible Investment: . . . [including] exercis[ing] any other rights or remedies with respect to such Collateral Debt Security, Equity Security or Eligible Investment as provided in the related Underlying Instruments or tak[ing] any other action consistent with the terms of the Indenture which the Collateral Manager reasonably believes to be in the best interests of the Noteholders."  CMA § 2(d).

**The Triaxx-Owned Trusts**

28.    U.S. Bank serves and/or has served as RMBS Trustee for at least 24 of the Triaxx-Owned Trusts (the "U.S. Bank Trusts").  The Triaxx-Owned Trusts, created to facilitate RMBS transactions offered to investors in or around 2005-2007, are governed by their own set of governing agreements, mainly pooling and servicing agreements ("PSAs").  Investors such as the Triaxx CDOs hold Certificates in the Triaxx-Owned Trusts, which represent interests in the cash flows associated with the mortgage loans deposited into the Trusts.  The certificateholders are the beneficiaries of the Triaxx-Owned Trusts.  The performance of those Trusts depended on the sponsors depositing properly underwritten and fully documented mortgage loans.  The quality of the mortgage loans (including the value of the underlying properties and the creditworthiness of the borrowers) is critical, and numerous provisions of the Triaxx-Owned Trusts' governing

8

6175651-1

agreements assure that only qualifying loans would be deposited into the Trusts.  Further, because the Triaxx-Owned Trusts and their Certificates were "mortgage-backed," numerous other contractual provisions seek to assure that complete documentation for each loan, including an original mortgage note and a properly assigned mortgage, would be delivered to the trustee of the Triaxx-Owned Trusts.

29.     The trustees of the Triaxx-Owned Trusts owed the certificateholders such as the Triaxx CDOs certain contractual and common law duties with respect to the mortgage loans held by the Trusts.  The trustees, including U.S. Bank as RMBS Trustee for the U.S. Bank Trusts, and the other parties to the Triaxx-Owned Trusts, including the servicers and master servicers, were required to provide notice of breaches of representations and warranties by the sponsors and the parties that originated the mortgage loans backing the Triaxx-Owned Trusts (the "originators") concerning key attributes of the mortgage loans held by the Trusts, including adherence to the origination guidelines applicable to those loans and to state laws regarding predatory lending. Additionally, the trustees, including U.S. Bank for the 24 U.S. Bank Trusts, had an express duty to enforce the obligation of the responsible parties to repurchase loans that breached representation and warranty provisions or that were missing required documentation.  The trustees were also required to address defaults by the servicers, which were required to engage in prudent servicing and loss mitigation practices, and by the master servicers, which were required to supervise the servicers.

30.     For 13 of the U.S. Bank Trusts, affiliates of Citi serve and/or served as Sponsor/Depositor, Paying Agent, Servicer and Master Servicer.  For 9 of the U.S. Bank Trusts, Wells Fargo Bank N.A. serves and/or served as Master Servicer.  For 5 of the U.S. Bank Trusts, affiliates of Credit Suisse First Boston Mortgage Securities Corporation ("Credit Suisse") serve

9

and/or served as Seller/Sponsor, Depositor and Servicer.  Affiliates of GS Mortgage Securities Corporation serve and/or served as the Seller/Sponsor and Depositor for 6 U.S. Bank Trusts.  These counterparties, which are but a few examples of the U.S. Bank Trust counterparties, are all major players in RMBS financing, and are parties, along with U.S. Bank, to numerous other RMBS securitizations and business deals.

**B.    U.S. Bank's Conflicts of Interest**

31.    U.S. Bank failed to discharge its pre- and post-default duties owed to the Triaxx CDOs and Collateral Manager because doing so would have conflicted with its own interests.

32.    Specifically, bringing or pursuing, or assigning authority to bring or pursue, the Actions would have conflicted with U.S. Bank's interests because the Actions sought recoveries directly from U.S. Bank as RMBS Trustee, and from others similarly situated.

**1.    U.S. Bank Was Inherently Conflicted Because it Faced Liability for its Own Wrongful Servicing Activities, Which Liability it Did Not Wish to Concede**

33.    U.S. Bank failed to act to protect the RMBS and their certificateholders against representation and warranty breaches and servicer/master servicer violations because it would have called attention to the fact that U.S. Bank itself was engaged in the same servicing misconduct in its role as servicer/master servicer for other mortgages and RMBS trusts.

34.    U.S. Bank's conflicts of interest are well-documented by investigations and enforcement actions taken by United States regulatory authorities.

35.    In 2010, multiple governmental agencies conducted on-site reviews of the adequacy of controls and governance over servicers' foreclosure processes at U.S. Bank.  The reviews uncovered significant problems in foreclosure processing at U.S. Bank, including "critical

10

weaknesses in [U.S. Bank's] foreclosure governance processes, foreclosure document preparation processes, and oversight and monitoring of third-party vendors, including foreclosure attorneys."[2]

36.    On April 13, 2011, based on the deficiencies in the review and risk of additional issues as a result of weak controls and processes, the Federal Reserve Board initiated a formal enforcement action requiring U.S. Bancorp, the corporate parent of U.S. Bank, to address its pattern of misconduct and negligence related to deficient practices in residential mortgage loan servicing and foreclosure processing.  According to the Federal Reserve Board press release, "[t]hese deficiencies represent significant and pervasive compliance failures and unsafe and unsound practices at [U.S. Bancorp]."  The enforcement action required U.S. Bancorp to improve its residential mortgage loan servicing and foreclosure practices.

37.    As part of the enforcement action, U.S. Bank entered into a consent order with the Federal Reserve Board, which found that U.S. Bank had engaged in "unsafe or unsound practices with respect to the manner in which [U.S. Bank] handled various foreclosure and related activities."

38.    In addition, the U.S. Treasury's Office of the Comptroller of the Currency (the "OCC") entered into consent orders with U.S. Bank and several other servicers (the "OCC Consent Orders").  In the OCC Consent Order with U.S. Bank, the government found, among other things, that beginning in 2009, U.S. Bank filed false or otherwise defective affidavits in connection with foreclosure proceedings and failed to exercise adequate oversight, internal controls, policies, procedures, compliance risk management, internal audit, third-party management, and training for its foreclosure-related services.

---

[2] *See* Interagency Review of Foreclosure Policies and Practices (Apr.  2011), *available at*
https://www.occ.gov/news-issuances/news-releases/2011/nr-occ-2011-47a.pdf.

39.     Despite pledging to reform its servicing misconduct and foreclosure abuses approximately a decade ago, U.S. Bank has still failed to comply with applicable federal regulatory standards.  On June 17, 2015, the OCC announced that it was imposing further restrictions on the mortgage servicing operations of U.S. Bank and five other banks for failing to meet the requirements of the prior consent orders and "continu[ing] to engage in unsafe and unsound practices" in violation of the prior consent orders.[3]

40.     In short, because U.S. Bank itself was engaging in the same illicit and improper acts as the servicers for the RMBS, U.S. Bank failed to enforce the servicer violations, or even alert the certificateholders to the servicers' misconduct.

**2.     Acknowledging Servicing Failures Would have Exposed U.S. Bank to Liability as Trustee for Other Securitizations**

41.     Enforcing servicer/master servicer violations also created a conflict for U.S. Bank in that it would have required U.S. Bank to declare and/or acknowledge the existence of an event of default pursuant to the underlying RMBS agreements.  Namely, highlighting the servicers' or master servicers' misconduct would have placed U.S. Bank in the spotlight for similar misconduct in its own securitizations.  This is because, under both securitization law and contract, upon the existence of a servicing event of default, the duties of a securitization trustee are no longer limited to those duties expressly set forth in the indenture, and the trustee becomes akin to a true fiduciary, taking on the duty to act as a prudent person would under the circumstances in the conduct of his or her own affairs.

42.     Thus, if U.S. Bank acknowledged the existence of defaults in a securitization for which it served as trustee, it would take on heightened prudent person duties in

---

[3] *See* Press Release, Office of Comptroller of Currency, *OCC to Escheat Funds from the Foreclosure Review, Terminates Orders Against Three Mortgage Servicers, Imposes Restrictions on Six Others* (June 17, 2015), *available at* http://www.occ.gov/news-issuances/news-releases/2015/nr-occ-2015-85.html.

6175651-1

that securitization; moreover, it would likely have had to concede that similar defaults had occurred in other securitizations, subjecting the trustee to heightened duties in those other deals with the same or similar counterparties. These heightened duties could require U.S. Bank to investigate and possibly enforce other deal parties' breaches of duty—including breaches or representations and warranties by the deals' sponsors and originators—or else risk liability for failing to do so. U.S. Bank wanted to avoid this domino effect of responsibility.

43.    U.S. Bank serves as trustee of numerous other trusts involving the same servicers, master servicers, sponsors, depositors, and originators (the "Deal Parties") that serve in these capacities for the Triaxx-Owned Trusts. Thus, it was not in U.S. Bank's interest to acknowledge these parties' improper practices, because doing so would have meant acknowledging such wrongdoing in dozens of other RMBS securitizations for which U.S. Bank serves as trustee or a Deal Party. Further, if U.S. Bank had taken the position that the servicers' or master servicers' practices in the RMBS breached their obligations, U.S. Bank also would have increased its liability in foreclosure-related lawsuits, given the trustee's substantial involvement in servicing activities.

### 3.    U.S. Bank Also Originated Defective Loans

44.    U.S. Bank, as an originator for other RMBS trusts, sold hundreds of millions of dollars of loans, many of which materially breached representations and warranties made by U.S. Bank. Accordingly, U.S. Bank itself faced enormous repurchase liability. By refusing to enforce such breach of representations and warranty claims against other originators, U.S. Bank hoped to shield itself from liability for the same types of breaches.

### 4.    U.S Bank was Economically Beholden to the Mortgage Loan Sellers

45.    Trustees are selected by the sponsor, which is often an affiliate of the servicer. Although U.S. Bank was charged with representing the interests of certain of the RMBS

13

6175651-1

trusts and their certificateholders in its capacity as RMBS Trustee, it was economically beholden to the sponsors. Indeed, U.S. Bank had close, repeat business relationships with most, if not all, of the sponsors.

46. Between 2003 and 2009, private-label RMBS offerings totaled more than $3 trillion. However, only a handful of U.S. financial institutions served as trustees and reaped significant fees. U.S. Bank had the second largest market share, at 17% of the $3 trillion market. In short, U.S. Bank failed to protect the Triaxx CDOs because it did not want to risk losing significant business from the sponsors of RMBS trusts generally. In addition, the RMBS Trustee engagements further deepened U.S. Bank's business relationships with the sponsors and underwriters of the RMBS, leading to "cross-selling" opportunities and more lucrative future engagements.

C. **U.S. Bank's Interference with the Triaxx CDOs' and Collateral Manager's Underlying Actions and Attempts to Secure the Collateral**

47. The CDO and RMBS trustees, including U.S. Bank, had knowledge that many of the loans collateralizing the Triaxx-Owned Trusts were not accurately represented and/or were not properly serviced.

48. The RMBS trustees were obligated, but neglected to, among other things, give notice of the burgeoning mortgage loan failures, give notice of and pursue representation and warranty claims against the sellers, or enforce servicer/master servicer breaches.

49. The RMBS servicers were obligated to avoid conflicts of interest and carry out their duties with due care. The servicers breached these duties by, among other things, improperly modifying loans, improperly liquidating loans, incurring inordinate losses in sales, delaying action on delinquent loans, and failing to complete foreclosures and dispositions.

14

50.     As CDO Trustee, U.S. Bank was required to take actions necessary to protect the Collateral.  The CDO Trustee took no such action, forfeiting valuable rights belonging to the Triaxx CDOs and CDO Noteholders.

51.     Accordingly, the Triaxx CDOs and Collateral Manager sent demands to U.S. Bank and initiated various litigations against the trustees and services of the Triaxx-Owned Trusts.

### 1.     The 2016 U.S. Bank Action

52.     In March of 2016, the Triaxx CDOs commenced *Triaxx Prime CDO 2006-1, Ltd, et al. v. U.S. Bank Nat'l Assoc., et al.,* No. 16-Civ. 01597 (S.D.N.Y.) (the "2016 U.S. Bank Action"), asserting breach of contract and breach of fiduciary duty claims against RMBS trustees U.S. Bank, Bank of New York Mellon ("BNY Mellon"), and J.P. Morgan Chase & Co.  The Triaxx CDOs voluntarily dismissed all claims against J.P. Morgan Chase & Co. on April 21, 2016, without prejudice, and filed a First Amended Complaint on May 3, 2016, asserting claims against U.S. Bank and BNY Mellon only.  The Triaxx CDOs alleged that they suffered approximately $300 million in damages based on U.S. Bank's and BNY Mellon's breaches of their contractual and extra-contractual duties as the trustees of certain of the Triaxx-Owned Trusts.  Of that $300-plus million, the Triaxx CDOs sought well over $200 million directly from U.S. Bank.

53.     Defendants U.S. Bank and BNY Mellon moved to dismiss.  Defendants argued, *inter alia*, that the Triaxx CDOs lacked standing because they had granted all right, title, and interest in the Collateral to the CDO Trustee under the Indentures.

54.     On August 11, 2016, while Defendants' motions to dismiss were pending, the Collateral Manager sent a letter to U.S. Bank, demanding, *inter alia*, that U.S. Bank, as CDO Trustee, assign and grant back to the Triaxx CDOs all right and standing to assert the claims in the 2016 U.S. Bank Action.  U.S. Bank refused to do so.

15

6175651-1

55.     On March 21, 2017, the District Court granted the defendants' motion to dismiss the First Amended Complaint, finding that the Triaxx CDOs lacked standing to bring their contract claims and that they abandoned their contractually-based breach of fiduciary duty claims. *Triaxx Prime CDO 2006-1, Ltd. v. Bank of New York Mellon*, 16 CIV. 1597 (NRB), 2017 WL 1103033 (S.D.N.Y. Mar. 21, 2017).

56.     On April 18, 2017, the Collateral Manager sent another letter to U.S. Bank, demanding, *inter alia*, that U.S. Bank, as CDO Trustee, assign its authority to the Triaxx CDOs or the Collateral Manager, and appoint the Collateral Manager as its designee, to pursue the 2016 U.S. Bank Action on its behalf.  U.S. Bank again refused to do so.

57.     Thereafter, the Triaxx CDOs filed their Second and Third Amended Complaints, asserting causes of action against Defendants for breach of contract, negligence/failure to avoid conflicts, breach of fiduciary duty, and breach of duty and equitable relief.

58.     Defendants moved to dismiss the Triaxx CDOs' Third Amended Complaint, and the District Court granted the defendants' motion.  The District Court again found that the Triaxx CDOs lacked standing to bring the breach of contract claims.  The District Court also found that the Triaxx CDOs retained standing to bring the tort claims, but ultimately dismissed those claims on other grounds. *Triaxx Prime CDO 2006-1, Ltd. v Bank of New York Mellon*, 16 CIV. 1597 (NRB), 2018 WL 1417850 (S.D.N.Y. Mar. 8, 2018).

59.     The Second Circuit affirmed the District Court's decision by Summary Order. *Triaxx Prime CDO 2006-1, Ltd. v U.S. Bank N.A.*, 741 F. App'x 857 (2d Cir. 2018).  Thus, according to the Second Circuit, the Agreements vest only the CDO Trustee—U.S. Bank—with

16

authority to sue the RMBS Trustee—in that action, also U.S. Bank—and others similarly situated, for their breaches.

### 2. The Ocwen Action

60. In February of 2017, the Triaxx CDOs initiated an action against Ocwen Loan Servicing, LLC ("Ocwen"), a servicer for some of the Triaxx-Owned Trusts. *Triaxx Prime CDO 2006-1, Ltd, et al. v. Ocwen Loan Servicing, LLC*, No. 17-cv-80203 (S.D. Fla.) (the "Ocwen Action"). The Triaxx CDOs alleged that they suffered losses of approximately $175 million because Ocwen breached its contractual and extra-contractual duties to properly service the mortgage loans in certain of the Trusts. The Triaxx CDOs also alleged that Ocwen acted with gross negligence in improperly modifying loans, improperly liquidating loans, incurring unexplained losses in sales, unreasonably delaying action on delinquent loans, and failing to complete foreclosures.

61. Ocwen moved to dismiss the complaint, arguing that the Triaxx CDOs lacked standing because they had granted all right, title, and interest in the Collateral to the CDO Trustee under the Indentures. The District Court dismissed the action without prejudice, finding the Triaxx CDOs lacked standing because the Indentures' Granting Clauses constitute a complete assignment of claims for breach of the contracts governing the underlying Collateral. *See Triaxx Prime CDO 2006-1, Ltd. v Ocwen Loan Servicing LLC*, 9:17-CV-80203, 2017 WL 4415912 (S.D. Fla. Oct. 4, 2017).

62. Thereafter, the Triaxx CDOs filed an amended complaint against Ocwen, adding the Collateral Manager as a plaintiff. Ocwen renewed its motion to dismiss for lack of standing and for failure to state a claim. The District Court dismissed the amended complaint with prejudice. *Triaxx Prime CDO 2006-1, Ltd. v Ocwen Loan Servicing LLC*, 9:17-CV-80203, 2018 WL 910480 (S.D. Fla. Jan. 23, 2018).

17

6175651-1

63. In February of 2018, Plaintiffs appealed the District Court's decision to the Eleventh Circuit. In February of 2019, the Eleventh Circuit affirmed the District Court's decision, effectively holding that only the CDO Trustee had standing to bring the claims asserted in the Ocwen Action. *See Triaxx Prime CDO 2006-1, Ltd. v Ocwen Loan Servicing, LLC*, 762 F. App'x 601 (11th Cir. 2019).

### 3. The HSBC Action

64. In December 2015, the Triaxx CDOs commenced *Triaxx Prime CDO 2006-1, Ltd, et al. v. HSBC Bank USA, N.A.*, No. 15-cv-10096 (S.D.N.Y.) (the "HSBC Action"), asserting five causes of action against HSBC as RMBS trustee: (1) breach of contract, (2) breach of fiduciary duty, (3) breach of duty to avoid conflicts of interest, (4) violation of the Streit Act, and (5) declaratory judgment.

65. The Triaxx CDOs alleged that HSBC failed to discharge its duties as an RMBS trustee for nine Triaxx-Owned Trusts, causing losses in the amount of approximately $30 million to the Triaxx CDOs. Specifically, HSBC disregarded its duties under the applicable pooling and servicing agreements and common law, by ignoring and refusing to take action to remediate pervasive deficiencies in the underlying loan pools and servicing of those loan.

66. On January 20, 2016, the court ordered that its decision granting in part and denying in part HSBC's motion to dismiss the complaint in a related action, *Royal Park Investments SA/NV v. HSBC Bank, USA, N.A.*, 109 F. Supp. 3d 587 (S.D.N.Y. 2015), applied to the HSBC Action.

67. On February 22, 2016, the court so ordered the parties' stipulation, under which the Triaxx CDOs withdrew certain of their claims, including their claims for violation of the Streit Act and for declaratory judgment.

6175651-1

68. On March 7, 2016, HSBC filed its answer to the complaint. Between 2016 and 2019, the parties completed fact discovery and began expert discovery.

69. On March 30, 2020, as a result of the Second and Eleventh Circuits' holdings that the Triaxx CDOs lack standing to assert claims against trustees and servicers of the RMBS underlying the Collateral, the Triaxx CDOs voluntarily dismissed their claims against HSBC with prejudice, following a nominal settlement.

4. **Servicer Demands**

70. Beginning in approximately December 2015, the Triaxx CDOs requested that U.S. Bank provide loan origination files, servicing files, and servicing agreements for the U.S. Bank Trusts. Only the trustee of the RMBS trusts had access to and the right to obtain such information. By letter dated May 27, 2016, U.S. Bank for the first time addressed the entirety of the Triaxx CDOs information requests. U.S. Bank stated that it *might* be able to collect such information if the Triaxx CDOs were willing to enter into an agreement to direct and indemnify it to do so (a "D&I"). U.S. Bank also demanded that the Triaxx CDOs enter into a "tri-party agreement" governing the use of a third party vendor to collect, review and produce servicing files and other information requested, at the expense of the Triaxx CDOs.

71. Beginning June 3, 2016, the Triaxx CDOs made several requests that U.S. Bank provide a proposed "model tri-party agreement." Several weeks later, U.S. Bank stated that it was "in the process of locating a prior tri-party agreement that could be used as a model for the basis of a discussion" but that locating and preparing such model agreement would itself be time consuming and "expens[ive]." Thus, U.S. Bank indicated, it likely needed to discuss a separate agreement "on the costs associated with any subsequent revisions to the tri-party agreement." It also requested a D&I directing and indemnifying U.S. Bank to assist in locating the requested information, in addition to a D&I to litigate claims (as detailed below). Thus, after *seven months*

19

of inquiries, the Triaxx CDOs still had not been able to obtain even the most basic documentation to which they were entitled to under the governing agreements; instead, during that time, U.S. Bank erected three separate roadblocks for the Triaxx CDOs to overcome before U.S. Bank would even assist with providing the requested documents that were necessary to evaluate and/or establish the underlying claims.

72.    Because U.S. Bank refused to provide the loan origination and servicing files that would have constituted the best evidence of deal party misconduct, the Triaxx CDOs were forced to evaluate and pursue potential servicing misconduct based only upon analyses of publicly available information.  In April and May 2016, the Triaxx CDOs sent letters to various RMBS trustees, servicers, and master servicers, notifying them of servicer and master servicer failures and potential events of default for certain RMBS held in their respective trusts (collectively, the "EOD Letters").  One of those RMBS trustees was U.S. Bank, as trustee for the U.S. Bank Trusts.  The Triaxx CDOs sent the EOD Letters on the U.S. Bank Trusts to U.S. Bank on or about April 19, 2016 and May 19, 2016.  Among other things, these EOD Letters directed U.S. Bank to: (1) provide additional written notice to the servicers and master servicers of their failures to perform obligations with respect to certain loans, and (2) direct the servicers and master servicers to remedy those failures.  The EOD Letters further requested that U.S. Bank provide notice of such potential events of default to the applicable deal parties, in order to trigger the event of default procedures in the RMBS trusts' governing agreements.

73.    U.S. Bank responded with a campaign of delay and obstruction, the transparent aim of which was to prevent the Triaxx CDOs from causing U.S. Bank to investigate and pursue servicing claims—claims that created a conflict of interest for U.S. Bank.  Initially, U.S. Bank responded to the EOD Letters on most of the U.S. Bank Trusts by letter dated May 27,

20

6175651-1

2016, which stated that: 1) certain servicers and master servicers at issue had denied the allegations contained in the EOD Letters; 2) the Trustee would permit the remaining breaching parties to respond before completing its review; 3) based on currently available evidence, U.S. Bank was taking no position about any of the alleged breaches in the EOD Letters; and 4) until its review was complete, U.S. Bank did not intend to send notice to any deal parties regarding the alleged breaches. Yet, U.S. Bank also did not commit to investigate these claims any further or do anything substantive as part of its "review" of these alleged breaches. Indeed, in response to Triaxx's requests for further information to potentially corroborate these findings, U.S. Bank stated that:

> [T]he Trustee has initially determined that much of the requested information is not readily accessible and would be costly and time-intensive to retrieve and provide. If the trustee were to proceed to gather than information, there would be a significant risk that reimbursement of any associated costs, which could be substantial, would not be available or would be borne by the Trusts and ultimately other certificateholders. . . . The Trustee may nevertheless be willing to consider the Triaxx CDOs' requests for such information if the Triaxx CDOs provide a direction and funded indemnity to the Trustee to retrieve and provide the information, on terms acceptable to the Trustee.

74. U.S. Bank also sent a response letter regarding the Washington Mutual Mortgage Pass-Through Certificates Series 2007-1 Trust ("WMALT 2007-1") and the Washington Mutual Mortgage Pass-Through Certificates Series 2007-3 Trust ("WMALT 2007-3") on or about June 16, 2016. U.S. Bank took a similar position in this letter to the position taken in its May 27, 2016 letter with regard to the other 22 U.S. Bank Trusts, except that it also stated that U.S. Bank was open to discussing a proposed direction and indemnity agreement to pursue claims against the servicer of WMALT 2007-1 and WMALT 2007-3, on terms acceptable to U.S. Bank, and so long as the Triaxx CDOs provided it with a "notice to certificateholders concerning the Triaxx CDOs' proposal" prior to entering into any such discussions. U.S. Bank did not elaborate on the contents

21

of such notice or why such notice would be required prior to entering into direction and indemnity negotiations, nor did the WMALT governing agreements require same.

75. Over the next several months, the Triaxx CDOs proceeded to send detailed response letters to each of the applicable servicers or master servicers implicated in the EOD Letters for the U.S. Bank Trusts, copying U.S. Bank, in which the Triaxx CDOs rebutted the servicers' and/or master servicers' denials of wrongdoing. The Triaxx CDOs also attempted to engage U.S. Bank in discussions about providing a direction and indemnity to the Trustee to pursue the claims outlined in the EOD Letters.

76. Despite the fact that the Triaxx CDOs had provided EOD Letters and offers of direction and indemnity on each of the 24 U.S. Bank Trusts, U.S. Bank stated in further discussions that it was unwilling to declare an Event of Default on any of the Trusts and that it was willing to discuss a direction and indemnity on only one of those trusts—WMALT 2007-1—the one trust for which U.S. Bank had unilaterally determined that the Triaxx CDOs met the "threshold" required to direct the trustee under the governing agreements.

77. The reality was that the governing agreements did not specify any minimum "threshold" requirement to direct the trustee—instead, the typical governing agreement stated that the trustee would be exculpated from liability if it followed the direction of a holder meeting a certain holdings threshold. Nowhere did the governing agreements provide that U.S. Bank could refuse to act or refuse to accept direction unless directed by holders of such threshold, and in fact the trustee had certain duties to act on its own initiative, both before and after an Event of Default, when confronted with evidence of misconduct by the servicers and/or master servicers of the U.S. Bank Trusts. The governing agreements further provided the trustee with the right to be indemnified by the Trusts themselves for such actions, ensuring that U.S. Bank would not incur

22

any out-of-pocket costs or liabilities. However, U.S. Bank maintained its incorrect and self-serving interpretation of the governing agreements, demonstrating that it was unwilling to act to protect the U.S. Bank Trusts unless fully exculpated and placing its own interests above those of the Trusts' beneficiaries, in violation of its common law and contractual duties to the Trusts.

78. Nevertheless, the Triaxx CDOs attempted to negotiate a direction and indemnity agreement on WMALT 2007-1 while attempting to convince U.S. Bank to take action on the remaining trusts, and asked U.S. Bank to seek tolling agreements with the appropriate counterparties while those issues were being worked out. U.S. Bank first demanded a direction and indemnity to seek tolling agreements with the servicers and master servicers subject to the EOD Letters, but ultimately refused to enter into any reasonable direction and indemnity agreement in this regard, thus failing to obtain tolling and allowing valuable claims to expire. The Triaxx CDOs also requested that U.S. Bank send a Notice to Holders and Consent Solicitation on each of the Trusts for which it had determined that the Triaxx CDOs did not have sufficient holdings to direct, so that U.S. Bank could seek and obtain support from sufficient holders to provide it with exculpation for taking further remedial action. U.S. Bank refused to do so.

79. Meanwhile, the Triaxx CDOs continued the effort that they had begun in December 2015 to obtain U.S. Bank's assistance in obtaining servicing agreements and files for the U.S. Bank Trusts. Though U.S. Bank was the only party with access to and/or the right to obtain such documents from the servicers, U.S. Bank put up road block after road block with respect to these efforts, denying the Triaxx CDOs with evidence to confirm the initial findings in the EOD Letters. In this manner, U.S. Bank attempted to bury its head in the sand and prevent itself from obtaining the very facts and evidence that it claimed it needed to declare an Event of Default.

80.    With respect to negotiations surrounding a direction and indemnity to pursue litigation against the servicer on WMALT 2007-1, U.S. Bank made it clear from the outset that it took a dim view of claims against servicers in general, and repeatedly informed the Triaxx CDOs that other large investors had told U.S. Bank that servicing claims were expensive and time-consuming, and thus U.S. Bank was reluctant to pursue them.  U.S. Bank dragged its feet on responding to questions and comments on the direction and indemnity, causing weeks to elapse between receiving questions or comments regarding the direction and indemnity and responding to same.

81.    U.S. Bank then proceeded to erect unreasonable and unnecessary hurdles throughout the negotiation process that made the provision of direction and indemnity impossible or economically unworkable for the Triaxx CDOs (or, for that matter, any other holder).  Casting aside any semblance of the reasonableness required by law and the governing agreements, U.S. Bank took extreme and ever-shifting views of the funding required by the Triaxx CDOs to initiate litigation, essentially requiring the Triaxx CDOs to bankroll and backstop the trustee and each trust against even the most remote contingencies.  This was despite the fact that: 1) the Triaxx CDOs owned only a portion of the interests in each U.S. Bank Trust and would receive only a portion of the benefits that would accrue to all trust beneficiaries; 2) each of the U.S. Bank Trusts had significant cash available to pay for these contingencies and indemnify the trustee; and 3) both the Triaxx CDOs and the Collateral Manager were nevertheless offering to provide U.S. Bank with full indemnity against any losses or expenses suffered in connection with their direction.

82.    To wit, U.S. Bank not only required the Triaxx CDOs to agree to indemnify the trustee against any and all costs and losses to pursue servicing claims on WMALT 2007-1, but also required the Collateral Manager to provide a backstop/guarantee of that indemnity.  The

24

Collateral Manager ultimately agreed to enter into such a backstop agreement, but negotiations over such agreement reached an impasse when U.S. Bank refused to close a loophole that would have allowed U.S. Bank to "double dip" and obtain a windfall recovery if it were ever reimbursed for amounts already paid to it by the Collateral Manager.  U.S. Bank also demanded that the Collateral Manager put up $1 million in cash in an indemnity account to secure its guarantee, an unreasonable and unnecessary sum.

83.     U.S. Bank further demanded that the Triaxx CDOs put up a cash indemnification account containing the full amount necessary to fund the litigation, based on the remote concern that the servicer would cease turning over to the trustee amounts collected from borrowers, and thus cut off its access to trust funds.  The Triaxx CDOs had never heard of a servicer taking such action, nor could U.S. Bank provide an example of this having occurred, but the trustee still insisted that it was a likely outcome, and one that the Triaxx CDOs should post a full bond to protect against.  The Triaxx CDOs were already agreeing to indemnify the trustee against such a scenario but believed it would be unreasonable to require them to tie up in cash the amount necessary to cover this hypothetical shortfall prior to it taking place.  The Triaxx CDOs suggested that if such actions were undertaken by the servicer, the trustee would have court remedies available to it to allow it to access trust funds, as well as the ability to remove the servicer from its position.  The Triaxx CDOs also proposed that a contingency arrangement with litigation counsel be negotiated so that the U.S. Bank Trusts could litigate the servicing claims for minimal out-of-pocket costs in the event that trust funds were not available (something that would be known very shortly after the litigation began).  Yet, U.S. Bank rejected all of these proposed solutions and continued to insist that the Triaxx CDOs put up a large cash indemnity account to finance the entire litigation up front.

6175651-1

84.    Faced with the risk of losing these valuable claims entirely, the Triaxx CDOs agreed to discuss providing a large cash indemnity and asked what amount U.S. Bank would require it to put up.  U.S. Bank refused to commit to a set amount.  The Triaxx CDOs continued to press U.S. Bank for months to provide them with the amount of cash indemnity it was demanding, but still the Bank refused to commit to any particular number.  Ultimately, the Triaxx CDOs offered to put up $300,000 in such an account, at which point U.S. Bank advanced its request that the Collateral Manager also put up a cash indemnity in the amount of $1 million to back up its guarantee and "ensure an uninterrupted source of funding for the investigation and litigation."  This meant that at least $1.3 million would have to sit, uninvested, in a bank account throughout the entire course of the litigation, and for years following its resolution, if the Triaxx CDOs wished to have U.S. Bank enforce servicing claims.

85.    Late in the negotiations, and after the Triaxx CDOs had already agreed to fully indemnify the Trustee, along with putting up a cash indemnity account, and with the Collateral Manager having agreed to provide a backstop/guarantee for that indemnity and its own cash indemnity account, U.S. Bank suddenly raised a new issue: it claimed that the Triaxx CDOs faced monthly expense caps that prevented them from spending more than $150,000 to $175,000 per month in the litigation.  This should not have been an issue due to the availability of trust funds from the U.S. Bank Trusts, the Triaxx CDOs' indemnity agreement and cash indemnity account (not to mention the $150,000 to $175,000 that was available each month from each of the three Triaxx CDOs), and the Collateral Manager's backstop agreement and its own cash indemnity account.  Yet, U.S. Bank insisted that these expense caps, unless addressed, prevented it from accepting the direction of the Triaxx CDOs.

86.     Ironically, U.S. Bank, as trustee of the Triaxx CDOs, had the power to seek court relief from application of the expense caps, as it had done numerous times before in the RMBS trust context.  *See, e.g., In the matter of the SACO I Trust 2006-3, SACO I Trust 2006-5, SACO I Trust 2006-6, and SACO I Trust 2007-2*, Civil No. 62-TR-CV-13-40, Findings of Fact, Conclusions of Law and Order for Judgment with Respect to Joint Petition of U.S. Bank National Association et al., For Instructions in the Administration of Certain Trusts (D. Minn., Dec. 3, 2013).   When the Triaxx CDOs raised this fact and requested that U.S. Bank take action to lift such caps if it believed they created an issue, U.S. Bank's counsel responded that it only represented U.S. Bank in its capacity as underlying RMBS Trustee, and that they should reach out to a different law firm that represented U.S. Bank in its capacity as CDO Trustee to discuss if U.S Bank would be willing to pursue this solution.  The Triaxx CDOs were never able to secure U.S. Bank's agreement to assist it in lifting those expense caps, and yet U.S. Bank continued to cite to such caps as evidence of "funding issues" on the part of the Triaxx CDOs.

87.     Beyond raising issues regarding the Triaxx CDOs' ability to fund the litigations, U.S. Bank erected numerous other perceived hurdles to taking action on behalf of the U.S. Bank Trusts, including the following:

a.  U.S. Bank insisted that, even if it were willing to initiate litigation against the WMALT 2007-1 servicer by filing a summons with notice, it would not proceed to the filing of a complaint unless and until the Triaxx CDOs conducted (and paid for) a loan-level investigation of servicing claims to "substantiate" the investigation that the Triaxx CDOs has already undertaken and detailed in the EOD Letters.  Yet, U.S. Bank never enabled the Triaxx CDOs to obtain the servicing files and records they had been requesting since December 2015,

27

which would have been necessary to undertake such an investigation. Similarly, U.S. Bank never agreed to undertake such an investigation itself, even using trust funds.

b. U.S. Bank refused to agree use McKool Smith PC—the chosen counsel of the Triaxx CDOs—to prosecute the servicing claims if it ever did agree to pursue them. This was despite the fact that McKool Smith was the most experienced law firm at this type of litigation, had prepared the EOD Letters with the initial findings triggering these efforts, and had significant ongoing matters representing U.S. Bank as trustee with respect to RMBS litigation. U.S. Bank provided various reasons for this refusal, including citing to a lack of "focus" and purported strategic errors by McKool Smith, which they never identified with any specificity.

88. Each time that the Triaxx CDOs believed that they had offered U.S. Bank a reasonable solution to address its various concerns, U.S. Bank came up with a new concern that required a new set of solutions and additional delay. This process dragged out over a period of more than a year, placing the Triaxx CDOs in a game of "whac-a-mole" in which they could never fully satisfy U.S. Bank's various whims and hypothetical "concerns." Meanwhile, as U.S. Bank was engaging in this sham negotiation, servicing claims were becoming time barred with each passing day. Most frustratingly, U.S. Bank's counsel (the same counsel that was inventing these "concerns" and insisting that the Triaxx CDOs address them) continued to demand throughout this process that the Triaxx CDOs pay its legal bills incurred in this bad faith negotiation process. When the Triaxx CDOs refused to do so, as they believed those fees were not incurred in the interests of the trusts but in the interests of protecting U.S. Bank at the expense of the trusts, U.S.

6175651-1

Bank cited this refusal to pay as part of its laundry list of reasons for refusing to "accept" the Triaxx CDOs' direction to litigate.  Negotiations eventually reached an impasse when the Triaxx CDOs concluded that U.S. Bank would never accept reasonable direction and indemnity to litigate servicing claims.

89.     Early and often throughout this failed negotiation, the Triaxx CDOs suggested to U.S. Bank that it should step aside and appoint a separate trustee to handle the prosecution  of servicing claims.  Aside from U.S. Bank's conflicts of interest with pursuing servicing claims generally, U.S. Bank was in direct conflict with the Triaxx CDOs, which were pursing the U.S. Bank Action against U.S. Bank at that time.  When the Triaxx CDOs initially suggested a separate trustee at the outset of negotiations, U.S. Bank responded that it did not "like" using separate trustees and did not use them in practice.  Despite imploring U.S. Bank to consider same, the Triaxx CDOs were never able to secure U.S. Bank's agreement to step aside and appoint a neutral trustee.  The Triaxx CDOs were thus left with no choice but to attempt to negotiate in good faith for U.S. Bank to take action.

90.     However, as U.S. Bank's conflicts became more apparent and manifested themselves in blatant efforts by U.S. Bank to obstruct the pursuit of servicing claims, the Triaxx CDOs intensified their objections and calls for U.S. Bank to appoint a neutral, non-conflicted separate trustee to handle these efforts.  U.S. Bank ultimately asked if the Triaxx CDOs had candidates in mind and whether the Triaxx CDOs had used separate trustees in other similar scenarios.  The Triaxx CDOs responded by providing U.S. Bank with a number of candidates and explained that they had used separate trustees in a nearly identical, ongoing matter, in which a different trustee had agreed to appoint a separate trustee to pursue servicing claims.  The Triaxx CDOs put U.S. Bank's counsel in touch with its proposed candidates and with the other trustee

29

that had worked with the Triaxx CDOs to pursue servicing claims (and which cited none of the "funding issues" or other concerns that U.S. Bank had claimed prevented it from following the direction of the Triaxx CDOs). Nevertheless, U.S. Bank never engaged in substantive discussions regarding the appointment of a separate trustee and never agreed to consider same. Instead, it maintained fierce control over its role as trustee, so that it could continue to prevent the U.S. Bank Trusts from pursuing servicing claims. And these efforts accomplished U.S. Bank's goal: the U.S. Bank Trusts' servicing claims were never tolled or enforced, but continued to expire with each passing month.

**5.     U.S. Bank Breached its Duties as CDO Trustee in Failing to Neutrally Represent All Noteholders and the Collateral Manager in Efforts to Preserve the Three-Year Defaulted Securities**

91.     In *U.S. Bank National Association v. Triaxx Asset Management LLC*, No. 16-CV-08507 (AJN) (S.D.N.Y. 2017), an interpleader action, two senior noteholders, Cerberus Capital Management, L.P. ("Cerberus") and Pacific Investment Management Company LLC ("PIMCO"), sought a judicial determination as to whether the Collateral Manager was required to sell certain Collateral Debt Securities under the terms of the governing agreements. Cerberus and PIMCO argued that the governing agreements required the Collateral Manager to sell the securities within three years of default, while the Collateral Manager disagreed, contending that the contracts did not require such sale and that, in any event, as "Credit Improved Securities," many of the securities at issue did not have to be sold.

92.     U.S. Bank, the trustee responsible for holding the Collateral Debt Securities on behalf of the noteholders, brought the interpleader action. However, instead of remaining a neutral party, as was required of it as interpleader plaintiff, U.S. Bank wholly overlooked the interests of the other noteholders and the Collateral Manager when it colluded with PIMCO by allowing PIMCO to prepare the direct trial testimony of U.S. Bank's witness. Indeed, PIMCO

30

admitted on several occasions, including before the Court, that it drafted the direct testimony affidavit of Kenneth Sliwa, then-relationship manager at U.S. Bank, which was submitted by U.S. Bank in the action.

### D.     The Instant Demand to Assign or Pursue Claims

93.     Following the Second Circuit decision in the U.S. Bank Action, the Triaxx CDOs and Collateral Manager recognized that there could be no recovery for losses suffered by the Triaxx CDOs and CDO Noteholders against the RMBS trustees and servicers unless the CDO Trustee brought claims, assigned them to some other party, or otherwise allowed the pursuit of such claims.  However, the CDO Trustee for years refused (and continues to refuse) to litigate these claims.

94.     Accordingly, on December 5, 2018, the Collateral Manager, on behalf of the Triaxx CDOs, demanded that U.S. Bank assign all authority to pursue the Actions and any other claims relating to the Collateral for the CDO Notes to the Triaxx CDOs or to the Collateral Manager, and appoint the Collateral Manager as its designee with respect thereto.

95.     The Collateral Manager was empowered under the clear language of the Agreements, including Section 2(d) of the CMAs, to direct U.S. Bank to take such action to avoid its clear conflict of interest and comply with Section 7.5 of the Indentures, which requires the "Issuer or the Trustee on behalf of the Issuer) . . . [to] take such other action as may be necessary or advisable or desirable to secure the rights and remedies of the Secured Parties hereunder and to . . . (iv) enforce any of the Pledged Securities or other instruments or property included in the Collateral." *See also* CMA § 2(d) (The Collateral Manager may "take on behalf of the Issuer or direct the Trustee to take [various enumerated] actions with respect to a Collateral Debt Security, an Equity Security or an Eligible Investment: . . . [including] exercis[ing] any other rights or remedies with respect to such Collateral Debt Security, Equity Security or Eligible Investment as

31

6175651-1

provided in the related Underlying Instruments or tak[ing] any other action consistent with the terms of the Indenture which the Collateral Manager reasonably believes to be in the best interests of the Noteholders.").

96.     By letter dated December 17, 2018, U.S. Bank refused to follow the Collateral Manager's direction.  According to U.S. Bank, absent direction from a majority of the controlling class of CDO Noteholders, it has no obligation under the Indentures to pursue claims against any servicers or trustees of the RMBS to protect the Collateral or assign authority to pursue such claims.  This is plainly inaccurate, as CMA § 2(d), quoted in the prior paragraph, makes clear that U.S. Bank must also take direction from the Collateral Manager on these matters.

97.     U.S. Bank cites to Section 5.13 of the Indentures, which states that U.S. Bank need not follow any direction from the controlling class that U.S. Bank "determines might involve it in liability (unless the [CDO] Trustee has received satisfactory indemnity against such liability . . .)."  Thus, U.S. Bank appears to be attempting to set up a paradigm in which it is never required to follow the direction of anyone, because it can simply claim that it has not received satisfactory indemnity against any potential liability that it perceives.  Plainly, this cannot be correct or consistent with the intent of the Indentures.

98.     In refusing to pursue, accept direction with respect to, or assign authority to the Triaxx CDOs to pursue the Actions and other claims relating to the Collateral for the CDO Notes, U.S. Bank breached its duties under the Agreements and violated its legal obligation to avoid its irreconcilable conflict of interest.

E.     **The Results of U.S. Bank's Conflict of Interest**

99.     U.S. Bank's duty to act in the best interest of the CDO Noteholders and Triaxx CDOs requires it to facilitate legal action against itself and other similarly situated entities, thus creating an indisputable conflict of interest.

32

100.    Under the Second Circuit's decision in the U.S. Bank Action and the Eleventh Circuit's decision in the Ocwen Action, the Triaxx CDOs and Collateral Manager lack standing to bring actions against the RMBS trustees and servicers. Accordingly, in order to comply with its contractual and extra-contractual duties to the CDO Noteholders and the Triaxx CDOs, U.S. Bank, as CDO Trustee, was required to either: (1) sue itself and other similarly situated RMBS trustees and servicers for their contractual and extra-contractual breaches, or (2) assign authority to enforce or pursue such breach claims.

101.    Either scenario subjects U.S. Bank to a lawsuit(s) in which damages total over $100 million. However, Section 5.13 of the Indentures exempts the CDO Trustee from having to "take any action that it determines might involve it in liability." The CDO Trustee's duty to act in the best interest of the CDO Noteholders directly conflicts with Section 5.13 of the Indenture, as this duty requires the CDO Trustee to either commence legal action against itself or assign the authority to do so.

102.    Additionally, U.S. Bank is conflicted because the Triaxx CDOs have asked it to sue similarly situated trustees and servicers/master servicers. U.S. Bank is a trustee, loan originator and servicer; initiating legal proceedings against similarly situated entities would invariably draw attention to its own unlawful activities. Moreover, successful prosecution of such lawsuits would create legal precedent adverse to U.S. Bank's interest as a servicer/master servicer.

103.    Any trustee acting in good faith and subject to the indisputable conflicts of interest affecting U.S. Bank here would have long ago pursued, or stepped aside and permitted the Triaxx CDOs or the Collateral Manager to pursue the Actions. U.S. Bank has repeatedly refused to do so.

33

6175651-1

104.    As a result of U.S. Bank's conflict of interest, the Triaxx CDOs suffered losses of over $100 million.

### FIRST CLAIM FOR RELIEF
**(Breach of Contract)**

105.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

106.    The Agreements are valid contracts setting forth the duties U.S. Bank owed to the Triaxx CDOs, the CDO Noteholders, and the Collateral Manager.

107.    Plaintiffs at all times fully performed under the Agreements.

108.    Under the Indentures, U.S. Bank was required to, but failed to, act in the best interests of the Triaxx CDOs, the CDO Noteholders, and the Collateral Manager.

109.    Under Section 7.5 of the Indentures, U.S. Bank is required to "take such other action as may be necessary or advisable or desirable to secure the rights and remedies of the Secured Parties hereunder [including the CDO Noteholders and Collateral Manager] and to . . . (iv) enforce any of the Pledged Securities or other instruments or property in the Collateral."

110.    Under Section 2(d) of the Collateral Management Agreement, the Collateral Manager was authorized to "take on behalf of the Issuer or direct the Trustee to take [various enumerated] actions with respect to a Collateral Debt Security, an Equity Security or an Eligible Investment: . . . [including] exercis[ing] any other rights or remedies with respect to such Collateral Debt Security, Equity Security or Eligible Investment as provided in the related Underlying Instruments or tak[ing] any other action consistent with the terms of the Indenture which the Collateral Manager reasonably believes to be in the best interests of the Noteholders."

111.    Plaintiffs directed U.S. Bank to comply with Agreements by pursuing and/or assigning all authority to pursue the Actions and any other claims relating to the Collateral

34

for the CDO Notes to the Triaxx CDOs or to the Collateral Manager.  U.S. Bank refused to follow that direction.

112.  U.S. Bank breached its duties under the Agreements by refusing to pursue, take Plaintiffs' direction with respect to the pursuit of, appoint a neutral trustee with respect to the pursuit of, or assign authority to the Triaxx CDOs and/or Collateral Manager to pursue the Actions and other claims relating to the Collateral for the CDO Notes.

113.  U.S. Bank's breach of the Agreements directly and proximately caused damages to the value of the CDO Notes, thereby harming Plaintiffs and the CDO Noteholders.

114.  U.S. Bank has engaged in a continuing breach of the Agreements by failing to fulfill its duties.

115.  As a result of U.S. Bank's breach of contract, judgment should be entered in favor of Plaintiffs and against U.S. Bank in an amount to be proven at trial but not less than $100 million, plus interest.

## SECOND CLAIM FOR RELIEF
### (Negligence / Failure to Avoid Conflicts of Interest)

116.  Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs as if fully set forth herein.

117.  Under New York law, U.S. Bank, as CDO Trustee, has specific extra-contractual duties to the Plaintiffs and CDO Noteholders.  These duties include the duty to give the Plaintiffs and the CDO Noteholders undivided loyalty, free from any conflicting self-interest. Trustees like U.S. Bank must discharge their obligations with absolute singleness of purpose.  This common law duty to avoid conflicts of interest applies notwithstanding the terms of the Agreements that purport to define and limit the duties of the CDO Trustee.

35

6175651-1

118.    *First*, as CDO Trustee, U.S. Bank has an indisputable conflict of interest. In order to act in the best interests of the CDO Noteholders, the Triaxx CDOs and the Collateral Manager, U.S. Bank had to either: (1) sue itself, as RMBS Trustee, for its contractual and extra-contractual breaches, or (2) step aside and allow others to bring suit against itself.  Either scenario subjects U.S. Bank to a lawsuit in which damages total over $100 million.

119.    *Second*, U.S. Bank is conflicted because Plaintiffs have asked it to sue similarly situated trustees and servicers/master servicers.  U.S. Bank is itself a servicer and master servicer to other mortgage loans and RMBS trusts and was engaged in the same wrongful conduct at issue in the Actions.  U.S. Bank advanced its interests ahead of the CDO Noteholders because it did not want to draw attention to its own unlawful activities.  Moreover, successful prosecution of such claims would create legal precedent adverse to U.S. Bank's interest as a servicer/master servicer and as a trustee.

120.    *Third*, U.S. Bank is conflicted because it derives significant business through its relationships with sponsors, servicers and master servicers, and did not want to disrupt these business relationships by enforcing representation and warranty claims or declaring events of default.

121.    Due to these conflicts, Plaintiffs directed U.S. Bank to comply with the Agreements and avoid its irreconcilable conflict of interest by assigning all authority to pursue the Actions and any other claims relating to the Collateral for the CDO Notes to the Triaxx CDOs or to the Collateral Manager.  U.S. Bank refused to follow the Collateral Manager's direction.

122.    U.S. Bank's negligence in failing to avoid these conflicts of interest has directly and proximately caused damages to the value of the CDO Notes, thereby harming the Plaintiffs and CDO Noteholders.

6175651-1

123.    As a result of U.S. Bank's negligence, judgment should be entered in favor of Plaintiffs and against U.S. Bank in an amount to be proven at trial, plus interest.

**WHEREFORE**, the Plaintiffs demand judgment in their favor and against U.S. Bank as follows:

(i)    On its First Claim for Relief, awarding the Plaintiffs a money judgment against U.S. Bank in an amount to be determined at trial, but not less than $100 million, plus interest at the New York statutory rate of 9% per year from the applicable dates of breach to date of judgment; and

(ii)   On its Second Claim for Relief, awarding the Plaintiffs: (1) a money judgment against U.S. Bank in an amount to be determined at trial, plus interest at the New York statutory rate of 9% per year from the applicable dates of negligence to date of judgment, and (2) a declaratory judgment that U.S. Bank has operated and continues to operate in conflict of interest with the Plaintiffs and CDO Noteholders;

(iii)  Granting such other or further relief as the Court may deem just and proper.

Dated: New York, New York
       January 18, 2022

OLSHAN FROME WOLOSKY LLP

By:    /s/ John G. Moon
       John G. Moon
       Kerrin T. Klein
       1325 Avenue of the Americas
       New York, New York 10019
       (212) 451-2300
       *Attorneys for Plaintiffs*

37

6175651-1