UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/31/2024

| | |
|---|---|
| TRIAXX PRIME CDO 2006-1 LTD., et al., | |
| Plaintiffs, | 21-CV-11019 (BCM) |
| -against- | |
| U.S. BANK NATIONAL ASSOCIATION, | **OPINION AND ORDER** |
| Defendant. | |

**BARBARA MOSES, United States Magistrate Judge**.

Six years ago, in *Triaxx Prime CDO 2006-1, Ltd. v. Bank of New York Mellon*, 2018 WL 1417850 (S.D.N.Y. Mar. 8, 2018) (*Triaxx II*), *aff'd sub nom. Triaxx Prime CDO 2006-1, Ltd. v. U.S. Bank Nat'l Ass'n*, 741 F. App'x 857 (2d Cir. 2018) (*Triaxx III*), Judge Buchwald observed that this District was "awash in suits seeking redress for and attempting to apportion liability for" the losses incurred by residential mortgage-backed securities (RMBS), and collateralized debt obligations (CDOs) backed by RMBS, in the wake of the 2008-09 financial crisis. *Triaxx II*, at *1.

This case, filed in state court in late 2021, is yet another such suit. In fact, as discussed in more detail below, plaintiffs' current claims, which seek damages from defendant U.S. Bank National Association (U.S. Bank) in its capacity as the Trustee of three related RMBS-backed CDOs, are based on the same core factual allegations, and rely on the same theories of wrongdoing, as the equitable claim they brought against the same defendant – and lost – in *Triaxx II*. Although plaintiffs have narrowly escaped the bar of collateral estoppel (because Judge Buchwald rested her dismissal of the equitable claim on grounds not applicable to damages claims), this case must also be dismissed, pursuant to Fed. R. Civ. P. 12(b)(6), for failure to state a claim upon which relief may be granted.

## I.     BACKGROUND

### A.     The Parties and the Triaxx CDOs

Plaintiffs Triaxx Prime CDO 2006-1 Ltd., Triaxx Prime CDO 2006-2, Ltd., and Triaxx Prime CDO 2007-1, Ltd. (collectively, the Issuers) are special-purpose vehicles, incorporated in the Cayman Islands, formed for the purpose of issuing notes (the Notes or CDO Notes) in "three eponymous CDOs" known as Triaxx Prime CDO 2006-1, Triaxx Prime CDO 2006-2, and Triaxx Prime CDO 2007-1 (collectively the CDOs or the Triaxx CDOs). *See* Compl. (Dkt. 11) ¶¶ 4, 11, 18; *Triaxx II*, 2018 WL 1417850, at *1. Plaintiff Triaxx Asset Management, LLC (TAM or the Collateral Manager) has served at all relevant times as the Collateral Manager of the Triaxx CDOs. Compl. ¶ 12. Defendant U.S. Bank (the Trustee or CDO Trustee) has served at all relevant times as the Trustee of all three Triaxx CDOs. *Id.* ¶¶ 1, 13.

When the Triaxx CDOs were formed, in 2006 and 2007, the Issuers "purchased 144 RMBS having a notional value of approximately $11.74 billion," collateralized by pools of residential mortgages, and issued the Notes to investors (the Noteholders or CDO Noteholders), collateralized by the RMBS. Compl. ¶¶ 4, 18. The RMBS are evidenced by certificates (Certificates) entitling their holders to "the cash flows associated with the [underlying] mortgage loans." *Id.* ¶ 28. The CDO Notes, in turn, entitle the Noteholders to the cash flows generated by the RMBS. *Id.* ¶ 24.[1]

---

[1] In a CDO, the streams of principal and interest payments generated by the mortgages underlying the RMBS are distributed to different classes (or "tranches") of noteholders, in accordance with a "priority of payments" schedule (or "waterfall") set forth in the CDO's trust indenture. "Each tranche may have different principal balances, coupon rates, prepayment risks, and maturity dates." U.S. Securities and Exchange Commission, "Mortgage-Backed Securities and Collateralized Mortgage Obligations," available at https://www.investor.gov/introduction-investing/investing-basics/glossary/mortgage-backed-securities-and-collateralized (last visited March 31, 2024); *see also* Thomas P. Lemke et al, Mortgage-Backed Securities § 4:17 ("Instead of passing or paying these payments through *pro rata* to security holders . . . , payments on the mortgage loans or securities underlying a CMO are directed *sequentially* to CMO tranches having different interest rates, maturities, and payment schedules. Each CMO tranche has its own priority in the application

The Triaxx CDOs are governed by three substantially identical indentures (the Indentures), each running between the relevant Issuer and the Trustee, Compl. ¶ 19; Lorenzo Decl. (Dkt. 18), Exs. A-C, and three substantially identical Collateral Management Agreements (the CMAs), each running between the relevant Issuer and the Collateral Manager. Compl. ¶ 20; Lorenzo Decl. Exs. D-F.

Under the Indentures, the Issuers are not permitted to engage in any business "other than issuing and selling the Notes." Indentures (Ind.) § 7.12(a). To that end, pursuant to the Granting Clause of each Indenture, the Issuers granted their RMBS Certificates, and other Collateral underlying the Notes,[2] to the CDO Trustee, "for the benefit and security of" the CDO Noteholders and other secured parties, thereby constituting and irrevocably appointing the CDO Trustee their "true and lawful attorney," with:

> full power (in the name of the Issuer or otherwise), to exercise all rights of the Issuer with respect to the Collateral held for the benefit and security of the Secured Parties and to ask, require, demand, receive, settle, compromise, compound and give acquittance for any and all moneys and claims for moneys due and to become due under or arising out of any of the Collateral held for the benefit and security of the Secured Parties, to endorse any checks or other instruments or orders in connection therewith and to file any claims or take any action or institute any proceedings which the Trustee may deem to be necessary or advisable in the premises.

Ind. at 2. The Granting Clause continues:

---

of the cash flow generated by the mortgages and other underlying assets, based on priorities established in the trust indenture.").

[2] In addition to the RMBS Certificates originally purchased by the Issuers, the "Collateral" underlying the Notes includes "certain other assets, such as Equity Securities and Eligible Investments," as defined in the Indentures; "all payments on or with respect to" the RMBS; and "all proceeds, accessions, profits, income benefits, substitutions and replacements, whether voluntary or involuntary, of and to" any property of the Issuers. *U.S. Bank Nat'l Ass'n v. Triaxx Asset Mgmt. LLC*, 2021 WL 1227052, at *3 (S.D.N.Y. Mar. 31, 2021) (*Triaxx V*) (quoting Ind. at 1-2). In *Triaxx V*, this Court held that the Collateral granted to the CDO Trustee also includes any judgments or settlements obtained in "litigation against originators, sponsors, trustees, and services of the RMBS underlying the Triaxx CDOs." *Id*. at *7, 23-26.

> The power of attorney granted pursuant to this Indenture and all authority hereby conferred are granted and conferred solely to protect the Trustee's interest in the Collateral held for the benefit and security of the Secured Parties and shall not impose any duty upon the Trustee to exercise any power.

*Id.*; *see also id.* § 6.3(m) ("the permissive right of the Trustee to take or refrain from taking any actions enumerated in this Indenture shall not be construed as a duty"). Although the Indentures impose no general duty on the CDO Trustee to exercise any of its powers, a "Majority of the Controlling Class" of the CDO Noteholders "have the right to direct the Trustee in the conduct of any proceeding for any remedy available to the Trustee for exercising any trust, right, remedy, or power conferred on the Trustee," provided, among other things, that the Trustee is afforded sufficient indemnity. Ind. § 5.13.[3]

TAM, as Collateral Manager, is responsible for "the day-to-day management of the Collateral." Compl. ¶ 26. It was engaged by the Issuers, pursuant to the CMAs, as their "true and lawful agent and attorney-in-fact, with full power of substitution and full authority in the Issuer's name, place, and stead" to perform various enumerated duties with respect to the Collateral. CMAs at 1. Although TAM is not a signatory to the Indentures, it must, "subject to and in accordance with the Indenture and this [CMA], take on behalf of the Issuer or direct the Trustee to take" certain actions with respect to the Collateral, *id.* § 2(d), including exercising the Issuers' rights with respect to that Collateral or "or tak[ing] any other action consistent with the terms of the Indenture which the Collateral Manager reasonably believes to be in the best interests of the Noteholders." *Id.* § 2(d)(xi); *see also id.* § 9 ("The Collateral Manager shall perform its duties hereunder in accordance with the terms of this Agreement and the terms of the Indenture applicable to it.").

---

[3] Each of the Triaxx CDOs issued Senior Notes, comprised of Class A Notes (divided into subclasses such as A-1 and A-2) and Class B Notes, as well as Junior Notes of various classes. *See Ind.* § 1.1 (defining "Class," "Junior Notes," and "Senior Notes"). The "Controlling Class" means the most senior class of Notes then outstanding. *See id.* (defining "Controlling Class").

The RMBS underlying the Triaxx CDOs were themselves issued by trusts (the RMBS Trusts), which are "governed by their own set of governing agreements," typically called pooling and servicing agreements (PSAs), and have their own trustees (the RMBS Trustees). Compl. ¶¶ 1, 28.[4] In addition to serving as the CDO Trustee for the Triaxx CDOs, U.S. Bank serves as RMBS Trustee for "at least 24" of the RMBS Trusts underlying the Triaxx CDOs. Compl. ¶¶ 5, 28.

Plaintiffs allege that the RMBS Trustees owed the holders of the RMBS Certificates (Certificateholders) "certain contractual and common law duties with respect to the mortgage loans held by the [RMBS] Trusts." Compl. ¶ 29. Among other things, plaintiffs assert, the RMBS Trustees were required, by the PSAs governing the RMBS Trusts, to "provide notice of breaches of representations and warranties" by the sponsors and originators concerning the quality and characteristics of the loans sold to the trusts; to "enforce" the obligations of the originators and sponsors "to repurchase loans that breached representation and warranty provisions or that were missing required documentation"; and to "address" defaults by the servicers, who were supposed to engage in "prudent servicing and loss mitigation practices," and by the master servicers, who were supposed to "supervise the servicers." *Id.*

---

[4] As the New York Court of Appeals explained in *IKB Int'l, S.A. v. Wells Fargo Bank, N.A.*, 40 N.Y.3d 277, 220 N.E.3d 646 (2023): "RMBS are financial instruments, popular in the mid-2000s, backed by individual mortgage loans. The securitization process involves a 'sponsor' who acquires a bundle of loans from banking institutions ('originators') and sells the pooled loans to a 'depositor,' who places the loans into a trust. The trust issues certificates purchased by investors, who are entitled to a portion of the revenue stream from the borrowers' payments. The mortgage loans in the trust are serviced by a 'servicer,' a party typically affiliated with the sponsor or originator. Each trust has a Trustee which acts on behalf of the Trust and whose responsibilities are prescribed by the securitization trusts' governing agreements." 197 N.Y.S.3d at 723, 220 N.E.3d at 650 (citations omitted).

### B.      Triaxx I, II, and III

The 2008-09 financial crisis revealed that "many of the loans collateralizing RMBS . . . were not accurately represented and/or were not properly serviced." Compl. ¶ 4. This in turn led to a wave of RMBS-related lawsuits, many of them alleging that "the trustees and servicers of those RMBS failed to perform their contractual and extra-contractual duties for the benefit of the RMBS [Certificateholders]." *Id*. Two of those lawsuits – one begun in this District and one in Florida – involved the Triaxx CDOs and, according to U.S, Bank, foreclose the present action. The Court summarizes those actions, and the resulting decisions, in some detail.

### 1.      Triaxx I

In 2016, the Issuers sued two RMBS Trustees – U.S. Bank and Bank of New York Mellon (BNYM) – for breach of contract and breach of fiduciary duty. *See Triaxx Prime CDO 2006-1, Ltd. v. Bank of New York Mellon*, 2017 WL 1103033, *1 (S.D.N.Y. Mar. 21, 2017) (*Triaxx I*). The Issuers alleged that the RMBS Trustees breached various duties under the relevant PSAs, including the duty to "provide notice" to "all parties" of breaches by the sponsors (or "sellers") of their representations and warranties concerning the "quality and characteristics" of the mortgages underlying the RMBS, and the duty to "effect seller obligations to cure, substitute, or repurchase" nonconforming loans. *Id*. at *2. According to the Issuers, the defendant RMBS Trustees were "liable to them for $371 million" due to their beaches of these duties. *Id*.

Judge Buchwald dismissed the contract claims on standing grounds, holding that when the Issuers transferred the RMBS to the CDO Trustee under the Granting Clause of the Indentures, they also transferred the right to bring contract claims founded on the underlying PSAs. *Triaxx I*, 2017 WL 1103033, at *3. The Collateral Manager also lacked standing to bring those contract claims, notwithstanding § 2(d) of the CMAs, because "as the CDO Issuers' agent" it had "no greater rights than its principals." *Id*. at *4. The court then specifically rejected the Issuers' contention that

TAM had "cure[d] the standing problem" by making a demand on U.S. Bank in its capacity as CDO Trustee to "assign the claims back" to the Issuers, explaining that the CDO Trustee had not in fact assigned the claims back to plaintiffs, "nor does it appear that it is contractually required to do so unless the demand comes from the 'Majority of the Controlling Class' of noteholders." *Id.* (citing Ind. § 5.13). Responding to plaintiffs' argument that it would be "absurd" if "only U.S. Bank (as CDO Indenture Trustee) may decide to sue U.S. Bank (as RMBS Trustee)," the court again observed that the CDO Noteholders – the ultimate beneficiaries of the Collateral – could, if they chose, direct the CDO Trustee to "assign the claims back to plaintiffs or to someone else." *Id.* at *5.

Turning to plaintiffs' fiduciary duty claims, Judge Buchwald noted that, under New York law, tort claims do not necessarily "transfer with a broad assignment of rights," 2017 WL 1103033, at *5, and suggested in *dicta* that although plaintiffs assigned away their standing to sue the RMBS Trustees for breach of contract, "it appears that they have retained their standing to bring extracontractual tort claims." *Id.* However, the court did not reach the merits of plaintiffs' tort claims as pleaded, because plaintiffs had expressly "abandoned" them. *Id.* at *5-6. Instead, the court granted plaintiffs one "final opportunity to amend the complaint." *Id.* at *6.

### 2.    Triaxx II

In *Triaxx II*, the court considered the Issuers' Third Amended Complaint (TAC),[5] in which they re-pled their contract claims against U.S. Bank and BNYM (First and Second Claims); set out two new tort claims against U.S. Bank and BNYM, for "negligence/failure to avoid conflicts" (Third and Fourth Claims) and "breach of fiduciary duty" (Fifth and Sixth Claims); and asserted a

---

[5] Lorenzo Decl. Ex. J.

final claim, for "breach of duty and equitable relief," against U.S. Bank only (Seventh Claim). TAC ¶¶ 148-99; *see also Triaxx II*, 2018 WL 1417850, at *2.

Judge Buchwald again dismissed the breach of contract claims for lack of standing, reiterating that the Issuers' grant of "all of [their] right, title, and interest" in the Collateral to the CDO Trustee, pursuant to the Granting Clause in the Indentures, included their right to sue on the PSAs. *Triaxx II*, 2018 WL 1417850, at *4. In this part of its opinion, the court rejected plaintiffs' newly-articulated argument that § 7.5 of the Indentures "circumscribe[d]" the Issuers' grant of their rights to the CDO Trustee, holding that nothing in § 7.5 "establish[es] Plaintiffs' right to sue to defend the value of the collateral." *Id*. (internal quotation marks and citation omitted).

As for the tort claims asserted against U.S. Bank and BNYM in their capacity as RMBS Trustees, Judge Buchwald held they failed for two reasons: first, because an RMBS Trustee does not "owe[] any duty to the CDO Issuer plaintiffs," who "ceased to be [RMBS] Certificateholders when they entered into the CDO Indentures," *Triaxx II*, 2018 WL 1417850, at *5; and second, because the fiduciary duty claims were "based on defendants' alleged violations of their . . . contractual obligations," such that plaintiffs' attempt to sue in tort was "barred by the economic loss doctrine, which provides that 'contracting party seeking only a benefit of the bargain recovery may not sue in tort notwithstanding the use of familiar tort language in its pleadings.'" *Id*. at *7 (quoting *BlackRock Allocation Target Shares: Series S. Portfolio v. Wells Fargo Bank, Nat'l Ass'n*, 247 F. Supp. 3d 377, 399 (S.D.N.Y. 2017)).

Finally, the court turned to the Issuers' newly-pleaded Seventh Claim for equitable relief, which – unlike the rest of the TAC – unmistakably sought relief against U.S. Bank in its capacity as CDO Trustee. The Issuers alleged that § 7.5 of the Indentures required them, or the CDO Trustee acting on their behalf, to pursue the claims that plaintiffs were attempting to assert against the

RMBS Trustees, but that they could not do so "without the cooperation of U.S. Bank as the CDO Trustee," making it "incumbent on U.S. Bank as the CDO Trustee to pursue or facilitate the pursuit of such claims." TAC ¶¶ 28, 193. Specifically, plaintiffs alleged, the CDO Trustee should assign the "right to pursue such claims" back to the Issuers or the Collateral Manager, so as to avoid its "irreconcilable conflict of interest." *Id*. ¶¶ 29, 194. To that end, on April 18, 2017 (three months before the TAC was filed), the Collateral Manager "directed U.S. Bank, as trustee, to assign its authority to the [Issuers] or to the Collateral Manager, and appoint the Collateral Manager as its designee, to pursue [the claims against the RMBS Trustees] on its behalf." *Id*. ¶¶ 30, 195. The CDO Trustee's failure to make such an assignment, according to the Issuers, was a breach of its duty to avoid conflicts, *id*. ¶¶ 30, 194, as well as a breach of its contractual duties under § 7.5 of the Indentures. *Id*. ¶¶ 30, 195. These breaches, the Issuers alleged, "directly and proximately caused damages to the Subject Trusts," for which there was "no adequate remedy at law." *Id*. ¶¶ 197-98. Plaintiffs concluded that the court should:

> . . . exercise its equitable power over U.S. Bank as a trustee to direct U.S. Bank to comply with the Collateral Manager's . . . letter of direction, and direct U.S. Bank, as trustee, to assign its authority to the [Issuers] or to the Collateral Manager, and appoint the Collateral Manager as its designee, to pursue the [claims against the RMBS Trustees] on its behalf.

*Id*. ¶ 199.

Judge Buchwald declined to do so, explaining that even if the court had the power to impose the equitable remedy sought, it would not be "appropriate in this case" because:

> The ultimate beneficiaries of any award here would be the noteholders of the CDOs, not the plaintiffs. The noteholders are sophisticated investors who have neither chosen to litigate this case nor attempted to direct the CDO Indenture Trustee to assign the claims back to the plaintiffs or to a third party. Therefore, we reject plaintiffs' assertion that any allegedly injured party has been deprived of an adequate remedy of law, and see no valid reason to grant plaintiffs this extraordinary relief.

*Triaxx II*, 2018 WL 1417850, at *7.[6] Thereupon, the court dismissed all of plaintiffs' claims with prejudice. *Id*. at *8.

### 3. Triaxx III

On appeal, the Second Circuit summarily affirmed the dismissal, agreeing that the Issuers lacked standing to assert their contract claims and that their "tort claims and claim for equitable relief fail to state claims upon which relief can be granted." *Triaxx III*, 741 F. App'x at 858.

### 4. Triaxx IV

*Triaxx Prime CDO 2006-1, Ltd. v Ocwen Loan Servicing, LLC*, 762 F. App'x 601 (11th Cir. 2019) (*Triaxx IV*), arose out of a lawsuit brought in the Southern District of Florida by the Issuers and the Collateral Manager against Ocwen Loan Servicing, LLC (Ocwen), which was the servicer or master servicer for certain RMBS Trusts underlying the Triaxx CDOs. In their amended complaint, plaintiffs "brought claims against Ocwen for breach of contract, as well as tort claims

---

[6] Judge Buchwald's observation that the CDO Noteholders are "sophisticated investors" who "chose[]" not to litigate against the RMBS Trustees is amply borne out by this Court's records, which demonstrate that the Senior Noteholders in the Triaxx CDOs can and do litigate – vigorously – when they believe their financial interests are threatened. *See, e.g.*, *U.S. Bank Nat'l Ass'n v. Triaxx Asset Mgmt. LLC*, 2019 WL 9511402 (S.D.N.Y. Sept. 16, 2019) (entering judgment after bench trial in favor of Senior Noteholder PIMCO in interpleader action prompted by demands from PIMCO and other Senior Noteholders that TAM sell certain RMBS because they were "Three-Year Defaulted Securities"), *aff'd,* 826 F. App'x 115 (2d Cir. 2020); *U.S. Bank Nat'l Ass'n v. Triaxx Asset Mgmt., LLC*, 2021 WL 4429213 (S.D.N.Y. Sept. 27, 2021) (denying PIMCO's post-trial motion for sanctions against TAM in Three-Year Defaulted Securities dispute); *Triaxx V*, 2021 WL 1227052, at *30 (resolving Rule 12(c) motions in complex interpleader dispute prompted by demands from Senior Noteholders PIMCO and Goldman Sachs that the CDO Trustee withhold certain "incentive payments" requested by TAM on behalf of its affiliate Phoenix); *U.S. Bank Nat'l Ass'n v. Triaxx Asset Mgmt. LLC*, 2021 WL 6201777, at *1 (S.D.N.Y. Dec. 31, 2021) (granting motion by Senior Noteholder Citigroup to intervene in dispute regarding Phoenix payments after PIMCO's position in one of the Triaxx CDOs was redeemed, depriving it of standing as to that CDO); *U.S. Bank Nat'l Ass'n as Tr. of Triaxx Prime CDO 2006-1, Ltd. v. XXX*, 72 Misc. 3d 1205(A), 147 N.Y.S.3d 891 (N.Y. Sup. Ct., N.Y. Cnty. June 28, 2021) (resolving Article 77 petition filed by the CDO Trustee and opposed by two Senior Noteholders, PIMCO and Serengeti Asset Management, concerning the timing of certain distributions to the Noteholders), *aff'd sub nom. U.S. Bank Nat'l Ass'n v. XXX*, 202 A.D.3d 498, 163 N.Y.S.3d 29 (1st Dep't 2022).

for breach of the duty to avoid conflicts of interest and to act with due care." 762 F. App'x at 604. The district judge dismissed all of plaintiffs' claims for lack of standing. *Id.*

The Eleventh Circuit affirmed, referring to the Issuers collectively as "Triaxx" and explaining that they lost standing to bring their contract claims when they granted their rights as RMBS Certificateholders to the CDO Trustee:

> With the breach-of-contract claim, Triaxx seeks to recover from Ocwen for losses that Triaxx claims it experienced as a certificateholder. We accept that when Triaxx bought the certificates, it acquired a contractual right as a certificateholder to sue Ocwen for certain breaches of the PSAs. The question we face here is whether Triaxx retained this contractual right after issuing the CDOs. Because the plain language of the Indenture Agreement establishes that Triaxx conveyed the certificates to the Indenture Trustee, we conclude that Triaxx retained no right as a certificateholder to sue Ocwen under the PSAs. The district court therefore properly dismissed Triaxx's breach-of-contract claim.

762 F. App'x at 605; *see also id.* at 609-10 (TAM's breach-of-contract claim "must be dismissed for the same reason as Triaxx's breach-of-contract claim," namely, that because Triaxx had no right to sue Ocwen, it could not have transferred that right to TAM).[7]

As for the tort claims, the Eleventh Circuit assumed, for purposes of the appeal, "that under New York law Ocwen owed the certificateholders extra-contractual duties to avoid conflicts of interest and to act with due care," but rejected plaintiffs' contention that those duties were owed *to them*, explaining: "[W]hen Triaxx issued the CDOs and transferred its 'right, title and interest in' the certificates to the Indenture Trustee, Ocwen owed the duties to avoid conflicts of interest and to act with due care to the Indenture Trustee, not Triaxx or TAM." 762 F. App'x at 610 (record citations omitted). Thus, the *Triaxx IV* court held, all of plaintiffs' claims were properly dismissed. *Id.*

---

[7] The Eleventh Circuit noted that it was interpreting "the same Indenture Agreement in the same way" that Judge Buchwald and the Second Circuit did in *Triaxx I*, *II*, and *III*. *See Triaxx IV*, 762 F. App'x at 606.

### C.      This Action

The Issuers and the Collateral Manager, as plaintiffs, commenced this action on December 3, 2021, by filing a Summons with Notice (Summons) (Dkt. 1-1) in New York Supreme Court. The Summons named U.S. Bank as the defendant but stated only that the "nature of this action is breach of contract and negligence/failure to avoid conflicts of interest in connection with your role as trustee to [the Triaxx CDOs]." Summons at ECF p.3. No further details were provided. Defendants removed the case to this Court, invoking its subject matter jurisdiction pursuant to 28 U.S.C. § 1332 (diversity) and 12 U.S.C. § 632 (the Edge Act). *See* Not. of Removal (Dkt. 1) ¶¶ 15-21. The case was accepted as related to *U.S. Bank National Association v. Triaxx Asset Management LLC*, No. 18-CV-4044 (the Interpleader Action), which involves many of the same parties, and on December 29, 2021, the two cases were consolidated. (Dkt. 9.)

On January 18, 2022, plaintiffs filed their Complaint (Dkt. 406 in Case No. 18-CV-4044; later refiled as Dkt. 11 in this action), which makes it clear that, despite the overlap in parties, the claims asserted herein are different from those asserted in the Interpleader Action.[8] Consequently, on February 15, 2022, this case was severed from the Interpleader Action pursuant to Fed. R. Civ. P. 21 (Dkt. 10), and has henceforth proceeded under own docket number. The parties have consented to the jurisdiction of the assigned magistrate judge for all purposes. (Dkt. 13.)

On April 8, 2022, defendant moved to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(6). (Dkt. 16.) Its motion is supported by a memorandum of law (Def. Mem.) (Dkt. 17) and the Lorenzo Declaration, attaching the Indentures, the CMAs, and other documents incorporated into the Complaint by reference, integral to the Complaint, or judicially noticeable. Plaintiffs filed

---

[8] *Triaxx V*, issued in the Interpleader Action, describes the events and transactions in dispute in that case. 2021 WL 1227052, at *3-17.

their opposition memorandum (Pl. Mem.) (Dkt. 21) on June 3, 2022, and defendant filed its reply brief (Def. Reply Mem.) (Dkt. 22) on June 24, 2022. The Court heard oral argument on October 26, 2022. *See* Tr. (Dkt. 25).

    **D.    Plaintiffs' Allegations**

The Complaint is lengthy and detailed, but can be summarized as follows: In the wake of the 2008-09 financial crisis, the Collateral Manager came to believe that many of the trustees and servicers of the RMBS Trusts underlying the Triaxx CDOs – including U.S. Bank, in its capacity as an RMBS Trustee – failed, in various ways, to "perform their contractual or extra-contractual duties." Compl. ¶¶ 1, 4, 29. Consequently, plaintiffs "initiated several actions, proceedings and pre-litigation demands" against those trustees and servicers, including the lawsuits underlying *Triaxx I-IV* (collectively the Actions). *Id*. ¶¶ 6, 52-59. However, the defendants in those cases argued – successfully – that "only the CDO Trustee had standing to pursue such claims (including against itself in its capacity as RMBS Trustee)." *Id*. ¶ 6.

By 2019, it was clear that "only U.S. Bank, as CDO Trustee, can bring or assign the right to bring claims on behalf of the [Issuers] and their Noteholders against U.S. Bank, as RMBS Trustee, and against other RMBS trustees or servicers." Compl. ¶ 7; *see also id*. ¶ 93 (following *Triaxx III*, plaintiffs "recognized that there could be no recovery for losses suffered by the Triaxx CDOs and CDO Noteholders against the RMBS trustees and servicers unless the CDO Trustee brought claims, assigned them to some other party, or otherwise allowed the pursuit of such claims"). TAM therefore "directed" the CDO Trustee "to assign its authority to pursue the Actions

and any related claims to either the [Issuers] or the Collateral Manager," most recently on December 5, 2018, *id*. ¶ 94, but defendant "refused." *Id*. ¶¶ 9, 96.[9]

Additionally, beginning in 2015, U.S. Bank put up "roadblocks," Compl. ¶ 71, when plaintiffs sought its assistance in collecting loan origination files and related documents for the RMBS Trusts, *see id*. ¶¶ 70, 79; "responded with a campaign of delay and obstruction," *id*. ¶ 73, when plaintiffs notified multiple deal parties of "potential events of default for certain RMBS held in their respective trusts," *id*. ¶ 72; and "dragged its feet," *id*. ¶ 80, when plaintiffs attempted to negotiate a "direction and indemnity" agreement (D&I) to pursue litigation against the servicer of an RMBS Trust known as WMALT 2007-1. *Id*. ¶¶ 78-88. Additionally, U.S. Bank refused to "step aside and appoint a separate [CDO] trustee to handle the prosecution of servicing claims," as plaintiffs repeatedly requested. *Id*. ¶¶ 89-90.

Plaintiffs allege that, by "refusing to pursue, accept direction with respect to, or assign authority to the [Issuers] to pursue the Actions and other claims relating to the Collateral for the CDO Notes," and by otherwise erecting "roadblocks" and to the pursuit of those Actions, "U.S. Bank breached its duties under the Agreements and violated its legal obligation to avoid its irreconcilable conflict of interest." Compl. ¶ 98.

Plaintiffs' First Claim, for breach of contract, *see* Compl. ¶¶ 105-15, alleges that the CDO Trustee breached two contractual provisions: § 7.5 of the Indentures, which – according to plaintiffs – required it to "take such action as may be necessary or desirable to secure the Collateral," *id*. ¶¶ 25, 95, 109, and § 2(d) of the CMAs, which required it to "take direction" from the Collateral Manager. *Id*. ¶¶ 96, 109-110.

---

[9] The December 5, 2018 letter followed similar letters on August 11, 2016, and April 18, 2017. Compl. ¶¶ 54, 56. The April 18, 2017 letter was, in part, the basis for the Issuers' Seventh Claim for equitable relief against the CDO Trustee before Judge Buchwald. *See* TAC ¶¶ 195-96.

Plaintiffs' Second Claim, for "negligence/failure to avoid conflicts of interest," *see* Compl. ¶¶ 116-24, alleges that defendant's refusal to honor its contractual obligations sprang from its "irreconcilable conflicts of interest." *Id.* ¶ 1. Insofar as the Actions would have run against U.S. Bank itself, in its capacity as an RMBS Trustee, defendant had a direct conflict. *Id.* ¶ 118. Insofar as those Actions would have run against "similarly situated trustees and servicers/master servicers," plaintiffs allege, defendant had indirect conflicts, because the lawsuits could "draw attention" to its own unlawful practices (in other RMBS Trusts where U.S. Bank served as Trustee or servicer), create adverse legal precedent, and/or interfere with U.S. Bank's business relationships with the targeted sponsors, servicers, and master servicers. *Id.* ¶¶ 119-2.

In both the First Claim and the Second Claim, plaintiffs allege that U.S. Bank's misconduct "directly and proximately caused damages to the value of the CDO Notes, thereby harming the Plaintiffs and CDO Noteholders." Compl. ¶¶ 113, 122. Plaintiffs estimate those damages at "over $100 million," *see id.* ¶¶ 3, 4, 101, 104, 115, 118, consisting of recoveries that could have been obtained in the Actions had U.S. Bank cooperated in pursuing them. *Id.* ¶ 101, 118.

Nowhere in the Complaint do plaintiffs allege that a Majority of the Controlling Class of CDO Noteholders – or indeed any CDO Noteholder – directed or requested that the CDO Trustee pursue the Actions or permit plaintiffs to do so.

## II.   ANALYSIS

U.S. Bank advances three primary arguments. First, it says, all of the "contract interpretation issues" on which plaintiffs' current claims depend were actually litigated and necessarily decided against them in the lawsuit that produced *Triaxx I-III* (the Prior Action), such that plaintiffs are collaterally estopped from relitigating them here. Def. Mem. at 10-12. Second, defendant contends, the plain terms of the Indentures and the CMAs (as correctly interpreted in *Triaxx I-IV*) foreclose plaintiffs' contract claim. *Id.* at 15-18. Third, defendant argues, the

Complaint fails to state a claim for negligence, because the Trustee does not owe plaintiffs any extra-contractual duty of care and because, under the "economic loss doctrine," no tort action will lie where the defendant's alleged breach of duty consists of "failing to act as it was contractually required to do." *Id.* at 23 (citation omitted). I address each issue in turn, applying the well-settled standards applicable to a motion to dismiss made pursuant to Rule 12(b)(6).

Under those standards, the Court accepts as true all well-pleaded factual statements alleged in the Complaint, *Ashcroft v. Iqbal*, 556 U.S. 662, 678, (2009), and "draws all reasonable inferences in favor of the non-moving party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions," *Iqbal*, 556 U.S. at 678, including legal conclusions about the meaning of the parties' contracts. *See Vysyaraju v. Mgmt. Health Sols., Inc.*, 2013 WL 4437236, at *1 (S.D.N.Y. Aug. 19, 2013) ("the Court is 'not constrained to accept the allegations of the complaint in respect of the construction of the Agreement'") (quoting *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir.1995)).[10]

If the plaintiffs fail to present "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," the deficient claims are subject to dismissal pursuant to Rule 12(b)(6). *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 65 (2d Cir. 2012) (quoting *Iqbal*, 556 U.S. at 678). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the

---

[10] In addition to the facts alleged in the Complaint itself, the Court appropriately considers the contents of "any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint," *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (quoting *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004)), including, as relevant here, the Indentures, the CMAs, and certain other documents attached to the Lorenzo Declaration.

misconduct alleged." *Iqbal*, 556 U.S. at 678. If the plaintiffs have not "nudged their claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

### A.      Collateral Estoppel

Under New York law, collateral estoppel, also known as issue preclusion, "bars relitigation of an issue when (1) the identical issue necessarily was decided in the prior action and is decisive of the present action, and (2) the party to be precluded from relitigating the issue had a full and fair opportunity to litigate the issue in the prior action." *Phoenix Light SF Ltd. v. Bank of New York Mellon*, 66 F.4th 365, 371 (2d Cir. 2023) (quoting *Plymouth Venture Partners, II, L.P. v. GTR Source, LLC*, 988 F.3d 634, 642 (2d Cir. 2021)); *see also Simmons v. Trans Express Inc.*, 37 N.Y.3d 107, 112, 170 N.E.3d 733, 737 (2021) (collateral estoppel applies where "'the issue in the second action is identical to an issue which was raised, necessarily decided and material in the first action,' and the party who is being estopped 'had a full and fair opportunity to litigate the issue in the earlier action'") (quoting *Parker v. Blauvelt Volunteer Fire Co.*, 93 N.Y.2d 343, 349, 712 N.E.2d 647, 651 (1999)). An issue was "necessarily decided" in the prior action if resolution of that issue was "necessary to support a valid and final judgment on the merits." *Conason v. Megan Holding, LLC*, 25 N.Y.3d 1, 17, 29 N.E.3d 215, 224 (2015). An issue is "'decisive in the present action' if it would prove or disprove, without more, an essential element of any of the claims set forth in the complaint." *Curry v. City of Syracuse*, 316 F.3d 324, 332 (2d Cir. 2003) (applying state law).[11]

---

[11] Defendant asserts that New York law governs the issue of collateral estoppel, *see* Def. Mem. at 10, while plaintiffs – without discussion – cite cases applying both New York and federal law. *See* Pl. Mem. at 12-16. The general rule is that "[t]he preclusive effect of a judgment rendered by a federal court sitting in diversity . . . is determined by the law of the state in which the rendering court sat," *Phoenix Light*, 66 F.4th at 371, while "[t]he preclusive effect of a federal court's

Defendant is correct that several key issues underlying plaintiffs' current claims were fully and fairly *litigated* in the Prior Action. In support of their Seventh Claim for equitable relief, the Issuers asserted – just as they do here – that § 7.5 of the Indentures required the CDO Trustee to "pursue or facilitate the pursuit" of the claims that the Issuers attempted to bring against the RMBS Trustees, *compare* TAC ¶¶ 28, 193 *to* Compl. ¶¶ 95, 98; that "[a]bsent an assignment of the right to pursue such claims to the [Issuers], or to the Collateral Manager, U.S. Bank was operating under an irreconcilable conflict of interest, which it has a legal obligation to avoid," *compare* TAC ¶¶ 29, 194 *to* Compl. ¶¶ 99-104; and consequently, that its failure to assign its right to sue the RMBS Trustees back to the Issuers (or the Collateral Manager) was "a breach of the CDO Trustee's duty to avoid conflicts as well as its duties under the Indentures, and in particular Section 7.5 thereof." *Compare* TAC ¶¶ 30, 195 *to* Compl. ¶¶ 116-23.

Defendant is also correct that collateral estoppel can apply even where – as here – plaintiffs' current claims "are based on a different [legal] theory or seek a different remedy" than their claims in the Prior Action. *Graven v. Children's Home R.T.F., Inc.*, 152 A.D.3d 1152, 1154, 60 N.Y.S.3d 556, 559 (3d Dep't 2017) (quoting *Corvetti v. Town of Lake Pleasant*, 146 A.D.3d at 1121, 46 N.Y.S.3d 679 (3d Dep't 2017)) (alteration in original); *see also Stegemann v. Rensselaer Cnty. Sheriff's Off.*, 2021 WL 5492966, at *3 (2d Cir. Nov. 23, 2021) (summary order) ("It does not matter that the claim in the latter case is based on a different legal theory so long as the same underlying issue was litigated in the prior proceeding."). I cannot agree, however, that all of the

---

judgment issued pursuant to its federal-question jurisdiction is governed by the federal common law of preclusion." *Wyly v. Weiss*, 697 F.3d 131, 140 (2d Cir. 2012). Plaintiffs in the Prior Action pleaded both diversity jurisdiction and Edge Act jurisdiction. *See* TAC ¶¶ 7-8. As is common in Edge Act cases, however, federal law did not supply the rule of decision for any of their claims. Given that the court was vested with diversity jurisdiction over the Prior Action, and that all of plaintiffs' claims in that action arose under New York law, this Court analyzes the preclusive effect of the judgment in that action under New York law as well.

issues pressed by plaintiffs in the Prior Action were *necessarily decided* in that action, *see Conason*, 25 N.Y.3d at 17, 29 N.E.3d at 224, as required for issue preclusion.

In order to plead a cognizable claim for equitable relief, a plaintiff must plausibly allege – in addition to some legally cognizable wrongdoing by the defendant – "the absence of an adequate remedy at law[.]" *Abdell v. City of New York*, 2009 WL 1270455, at *5 (S.D.N.Y. May 5, 2009) (quoting *New York State National Organization for Women v. Terry*, 886 F.2d 1339, 1362 (2d Cir. 1989)); *see also Reuben H. Donnelley Corp. v. Mark I Mktg. Corp.*, 893 F. Supp. 285, 293 (S.D.N.Y. 1995) (to survive a Rule 12(b)(6) motion, a claim for injunctive relief "must allege some wrongful conduct on the part of [the opposing party] for which their requested injunction is an appropriate remedy," and that the claimants "will suffer irreparable harm because of the conduct, e.g., that they have no adequate remedy at law, and that the balance of equities weighs in their favor"). Thus, when presented with a Rule 12(b)(6) motion to dismiss an equitable claim, the court may do so on adequate-remedy grounds alone. *See, e.g.*, *Deutsch v. JPMorgan Chase & Co.*, 2019 WL 4805689, at *5 (S.D.N.Y. Sept. 30, 2019) (dismissing "declaratory judgment and equitable relief" claims because plaintiff "made no showing that there is no adequate remedy at law for any of his claims"); *In re Gen. Motors LLC Ignition Switch Litig.*, 257 F. Supp. 3d 372, 409 (S.D.N.Y. 2017) (dismissing unjust enrichment claim because the plaintiff "has adequate remedies at law"), *modified on reconsideration, on other grounds*, 2017 WL 3443623 (S.D.N.Y. Aug. 9, 2017); *CDO Plus Master Fund Ltd. v. Wachovia Bank, N.A.*, 2009 WL 2033048, at *8 (S.D.N.Y. July 13, 2009) (dismissing specific performance claim where plaintiff failed to "demonstrate that [its] remedies at law are incomplete and inadequate") (quoting *Lucente v. Int'l Bus. Mach. Corp.*, 310 F.3d 243, 262 (2d Cir. 2002)).

In *Triaxx II* – as in the cases cited above – the court dismissed the Seventh Claim (the only claim asserted against the CDO Trustee) because plaintiffs failed to show "that any allegedly injured party has been deprived of an adequate remedy of law." 2018 WL 1417850, at *7.[12] In disposing of the claim on this ground, the court pointedly did not reach any of the questions that defendant characterizes as "decisive of the present action," such as whether the CDO Trustee was obligated (by § 7.5 of the Indentures, by § 2(d) of the CMAs, or by an extra-contractual duty to avoid conflicts of interest) to assign its right to sue on the PSAs back to the Issuers.

To be sure, *Triaxx II* includes a discussion of § 7.5 – in connection with the standing issue – and holds squarely, in that context, that § 7.5 "fail[s] to establish Plaintiffs' right to sue to defend the value of the collateral." 2018 WL 1417850, at *4 (internal quotation marks and citation omitted). *Triaxx II* did not, however, determine whether § 7.5 (or any other contractual provision) affirmatively obligated the CDO Trustee to assign back its standing to plaintiffs. For this point, defendant relies primarily on a single sentence from *Triaxx I*, in which the court considered plaintiffs' argument (based on Judge Forrest's opinion in *Phoenix Light SF Ltd. v. U.S. Bank Nat'l Ass'n*, 2016 WL 1169515 (S.D.N.Y. Mar. 22, 2016)),[13] that TAM's August 2016 letter "cure[d]"

---

[12] As the court explained, the CDO Noteholders – who could have directed the CDO Trustee to sue the RMBS Trustees or to assign the right to do so back to the Issuers – are "sophisticated investors who have neither chosen to litigate this case nor attempted to direct the CDO Indenture Trustee to assign the claims back to the plaintiffs or to a third party." *Triaxx II*, 2018 WL 1417850, at *7, thereby suggesting that the CDO Noteholders, who are the allegedly injured parties, could avail themselves of that "adequate remedy" simply by exercising their rights under § 5.13 of the Indentures.

[13] In that case, as in the Prior Action, the plaintiffs were CDO issuers who sought to sue RMBS trustees for alleged PSA breaches. After their initial complaint was dismissed for lack of standing, the issuers "obtain[ed] express assignments" from the relevant CDO trustees of "any rights the Trustees have to bring the claims herein," 2016 WL 1169515, at *1, 4. On those facts, Judge Forrest held that plaintiffs had "sufficiently alleged standing." *Id*. at *1.

their standing problem. 2017 WL 1103033, at *4. Judge Buchwald rejected that argument, explaining:

> Here, U.S. Bank (as CDO Indenture Trustee) has not assigned the claims back to the plaintiffs; nor does it appear that it is contractually required to do so unless the demand comes from the "Majority of the Controlling Class" of noteholders[.]

*Id*.

According to U.S. Bank, the second clause in the quoted sentence is a "holding" that was "essential to the complete dismissal of the Issuers' claims." Def. Reply Mem. at 3; *see also* Tr. at 17:23-18:2 (asserting that Judge Buchwald "held" that the CDO Trustee was not contractually required to assign its claims to plaintiffs absent a direction from the Noteholders). But the language used in that clause ("nor does it appear that . . . ") is not the language that a federal district judge ordinarily uses when *deciding* an issue of law or fact. To the contrary, it is very similar to the language the same federal district judge used, a few paragraphs later, to signal what was clearly *dicta. See Triaxx I*, 2017 WL 1103033, at 5 ("[T]he plaintiffs appear to have retained standing to sue the RMBS Trustees on tort claims arising outside of the contracts."). *Dicta* is "not subject to the preclusive effect of . . . collateral estoppel[.]" *B.Z. Chiropractic, P.C. v. Allstate Ins. Co.*, 197 A.D.3d 144, 146, 152 N.Y.3d 46, 49 (2d Dep't 2021).

Even if Judge Buchwald could be said to have *decided* that the CDO Trustee had no contractual obligation to assign its rights back to the Issuers absent a demand under § 5.13, it would be difficult to conclude that this issue was "necessary to support a valid and final judgment on the merits" in the Prior Action. *Conason*, 25 N.Y.3d at 17, 29 N.E.3d at 224 (holding that express findings of fraud, made in prior action, were not entitled to preclusive effect because they were made in connection with a claim that the court ultimately dismissed on other grounds, and were not necessary to a separate claim on which plaintiffs prevailed). To dismiss the contract claims on standing grounds, Judge Buchwald was required to determine whether the Issuers *in fact* had

authority to bring those claims – not whether they might be able to obtain such authority in the future by persuading or compelling the CDO Trustee to make an assignment. Thus, the court's "necessary" determination – contained in the first clause of the sentence quoted above – was that simply "U.S. Bank (as CDO Indenture Trustee) has not assigned the claims back to the plaintiffs." *Triaxx I*, 2017 WL 1103033, at *4.

Because the contract interpretation issues underlying plaintiffs' present claims were not actually and necessarily decided in the Prior Action, this Court cannot dismiss the present action on collateral estoppel grounds.[14]

### B.    Breach of Contract

Under New York law,[15] the elements of a cause of action for breach of contract are "(1) the existence of a contract, (2) performance of the contract by one party, (3) breach by the other party, and (4) damages suffered as a result of the breach." *Beautiful Jewellers Priv. Ltd. v. Tiffany & Co.*, 438 F. App'x 20, 21-22 (2d Cir. 2011) (summary order). U.S. Bank argues that it has not breached any of its contractual obligations because "the clear terms of the [a]greements," as well as prior caselaw, establish that "the Trustee is not 'contractually required' to pursue the RMBS

---

[14] For purposes of res judicata, also known as claim preclusion, the defendant need not show that any specific issues were actually litigated or necessarily decided in the prior action. To the contrary: the New York courts "have consistently applied a 'transactional analysis approach' in determining whether an earlier judgment has claim preclusive effect, such that 'once a claim is brought to a final conclusion, *all other claims arising out of the same transaction or series of transactions* are barred, even if based upon different theories or if seeking a different remedy.'" *Simmons*, 37 N.Y.3d at 111, 170 N.E.3d at 736 (quoting *O'Brien v. City of Syracuse*, 54 N.Y.2d 353, 357, 429 N.E.2d 1158 (1981)). Thus, claim preclusion "applies not only to claims actually litigated but also to claims that could have been raised in the prior litigation." *In re Estate of Hunter*, 4 N.Y.3d 260, 269, 827 N.E.2d 269, 275 (2005). However, U.S. Bank did not raise res judicata in its motion to dismiss, and this Court is disinclined to reach an issue that was not briefed or argued by the parties.

[15] The parties agree that New York law governs plaintiffs' contract and negligence claims. *See* Def. Mem. at 15, 20; Pl. Mem. at 3, 18, 22.

Claims, or otherwise take direction from the Collateral Manager." Def. Mem. at 15-16 (quoting *Triaxx I*, 2017 WL 1103033, at *4). In addition, defendant contends, the Complaint fails to allege any non-speculative damages – or indeed that plaintiffs (as opposed to the Noteholders) were damaged at all by any diminution in the value of the Notes. *Id.* at 18-19. The Court agrees with defendant that the Indentures did not require the CDO Trustee, under the circumstances here alleged, to "pursue, accept direction with respect to, or assign authority to the Triaxx CDOs to pursue the Actions," Compl. ¶ 98, and consequently does not address the parties' arguments as to contract damages.

Plaintiffs allege that the CDO Trustee breached § 7.5 of the Indentures and § 2(d) of the CMAs. Compl. ¶¶ 109, 110. The "plain language" of § 7.5, they say, "obligates Defendant to protect and enforce the instruments included within the Collateral, including by pursuing and allowing the pursuit of litigation," Pl. Mem. at 16-17, while § 2(d) of the CMAs "allow[s] the Collateral Manager to direct the CDO to take action in the best interest of the Plaintiffs and the CDO Noteholders." *Id.* at 18.

Section 7.5 of the Indentures, entitled "Protection of Collateral," provides, in relevant part:

(a)     The Issuer (or the Trustee on behalf of the Issuer) shall file any financing statements and any continuation statements, provided that the Issuer shall from time to time at the request of any Secured Party execute and deliver all such supplements and amendments hereto and upon receipt of an Opinion of Counsel, execute all such Financing Statements, continuation statements, instruments of further assurance and other instruments, and shall take such other action as may be necessary or advisable or desirable to secure the rights and remedies of the Secured Parties hereunder and to:

(i)     Grant more effectively all or any portion of the Collateral;

(ii)    maintain, preserve and perfect the lien (and the first priority nature thereof) of this Indenture or to carry out more effectively the purposes hereof;

(iii)    perfect, publish notice of or protect the validity of any Grant made or to be made by this Indenture (including any and all actions necessary or desirable as a result of changes in law or regulations);

(iv)    enforce any of the Pledged Securities or other instruments or property included in the Collateral;

(v)    preserve and defend title to the Collateral and the rights therein of the Trustee and the Holders of the Senior Notes against the claims of all persons and parties; or

(vi)    pursuant to Section 11.1(a) hereof, pay or cause to be paid any and all taxes levied or assessed upon all or any part of the Collateral.

Ind. § 7.5.[16] Plaintiffs focus on the language at the end of subsection (a) ("take such other action as may be necessary or advisable or desirable to secure the rights and remedies of the Secured Parties hereunder" and in subsection (a)(iv) ("enforce any of the Pledged Securities or other instruments or property included in the Collateral"), reading them together to create "affirmative obligations on the CDO Trustee to enforce the agreements underlying the Collateral," including through litigation, "independent of instruction from any party." Pl. Mem. at 18.

Plaintiffs are mistaken. An indenture, like any other contract, must be construed "so as to give full meaning and effect to all of its provisions." *Triaxx V*, 2021 WL 1227052, at *18 (quoting *In re AMR Corp.*, 730 F.3d 88, 98 (2d Cir. 2013)). Subsection (a)(iv), which appears in the midst of a laundry list relating to the perfection and priority of the CDOs' security interests in the Collateral, requires the Issuer (or the Trustee on its behalf) to enforce "the Pledged Securities" themselves, not the PSAs governing the underlying RMBS Trusts or the common-law rights of the parties to those PSAs.

---

[16] The "Secured Parties" are "the Senior Noteholders, the Hedge Counterparties, the Synthetic Security Counterparties, the Collateral Manager, the Collateral Administrator, the Fiscal Agent and the Trustee" Ind. at 1. The "Pledged Securities" are "(a) the Collateral Debt Securities, Equity Securities and Eligible Investments that have been Granted to the Trustee and (b) all non-Cash proceeds thereof, in each case, to the extent not released from the lien of this Indenture pursuant hereto." *Id*. § 1.1, at 33.

Moreover, plaintiffs' construction, if accepted, would create a conflict between § 7.5(a)(iv) and the clear mandate of other portions of the Indentures, which state plainly that the Trustee is not required to exercise its powers, *see, e.g.*, Ind. at 1-2 (granting "full power" to the Trustee to "take any action or institute any proceedings which the Trustee may deem to be necessary or advisable in the premises," but specifying that the grant of power "shall not impose any duty upon the Trustee to exercise any power"); *id*. § 6.3(m) ("the permissive right of the Trustee to take or refrain from taking any actions enumerated in this Indenture shall not be construed as a duty"), unless it is instructed to do by a Majority of the Controlling Class of the CDO Noteholders, *id*. § 5.13, *and* has been "afforded sufficient indemnity." *Id*.[17] It is impossible to square these provisions with plaintiffs' contention that §7.5(a)(iv) imposes upon the Trustee an affirmative and unbounded obligation to "to enforce the agreements underlying the Collateral," Pl. Mem. at 18, including by suing RMBS Trustees and other deal parties for breaches of the PSAs (and for breaches of their related common law duties), whether or not the Noteholders ask it to do so. Plaintiffs' proposed construction is particularly jarring given that the lawsuits (whether brought by the CDO Trustee itself or by the Issuers or Collateral Manager pursuant to an assignment) would be paid for out of the Collateral; that is, with funds that would otherwise flow to the Noteholders through the priority of payments waterfall.[18]

---

[17] As defendant points out, "[t]his allocation of responsibility is logical because the Noteholders . . . will bear the cost of [any legal] action by the Trustee and stand to receive whatever benefit comes if an action by the Trustee is successful." Def. Mem. at 16.

[18] The Trustee is entitled to reimbursement by the Issuers "for all reasonable expenses, disbursements and advances incurred or made by the Trustee in accordance with any provision of this Indenture or in the enforcement of any provision hereof . . ." Ind, § 6.8(a)(ii). But the Issuers are special-purpose vehicles with no assets of their own. Their obligations under the Indentures are "limited-recourse obligations" which are "payable solely from the Collateral in accordance with the Priority of Payments[.]" Ind. § 2.6. Similarly, the Collateral Manager's expenses, to the extent otherwise authorized by the CMAs, are paid out of the Collateral, ahead of the Noteholders, as "Other Administrative Expenses." *See* Ind. §§ 1.1, 11.1(a)(i)(2), 11.1(a)(ii)(1); *see also Triaxx*

In *Triaxx II*, the Issuers proffered the same expansive reading, of the same language, in support of their contention that § 7.5 *authorized them* to sue the RMBS Trustees.[19] Judge Buchwald rejected that interpretation, concluding that § 7.5 "concerns the preservation of a security interest in the collateral" rather than lawsuits against RMBS Trustees or other deal parties. 2018 WL 1417850, at *4.[20] Her analysis, while not preclusive as a matter of collateral estoppel, nonetheless lends further support to this Court's conclusion that § 7.5 simply does not speak to the conduct at issue here, and therefore did not require the Trustee to "enforce the agreements underlying the Collateral," Pl. Mem. at 18, in the absence of instruction from the Noteholders. Nor, in the absence of such instruction, was the CDO Trustee required to assign its claims to the Issuers or otherwise facilitate the Actions. *Triaxx I*, 2017 WL 1103033, at *4.

Section 2(d) of the CMAs does not alter the calculus.[21] According to plaintiffs, § 2(d)(xi) "allow[s] the Collateral Manager to direct the CDO Trustee to take action in the best interest of the Plaintiffs and CDO Noteholders." Pl. Mem. at 18. But any "directions" by the Collateral Manager must be "subject to and in accordance with the Indenture[.]" CMAs § 2(d); *see also id*.

---

*V*, 2021 WL 1227052, at *6 ("Pursuant to the Priority of Payments, 'Other Administrative Expenses' are paid before any interest or other payments are made to the Noteholders.").

[19] *See* Lorenzo Decl. Ex. K, at 11.

[20] The Southern District of Florida came to the same conclusion in *Triaxx Prime CDO 2006-1, Ltd. v. Ocwen Loan Servicing, LLC*, 2017 WL 3701251, at *3 (S.D. Fla. Aug. 21, 2017) ("the highlighted provisions of Section 7 of the Indenture fail to establish [the Issuers'] right to 'sue to defend the value of the collateral'"), *report and recommendation adopted*, 2017 WL 4415912 (S.D. Fla. Oct. 4, 2017).

[21] Neither does § 6.1(c) of the Indentures, cited by plaintiffs for the first time in their brief in opposition to the motion to dismiss. *See* Pl. Mem. at 19. Subsections (iii) and (v) state that the Trustee "shall not be liable" for any actions or omissions taken ("in good faith," for purposes of subsection (iii)) at the direction of the Collateral Manager, the Issuer, or the relevant Noteholders. While these provisions do indeed contemplate that there are "circumstances in which such direction is required or permitted by the terms of this Indenture," *id*. § 6.1(c)(v), they shed no light upon what those "circumstances" are, much less whether they are met here.

§ 2(p) (the Collateral Manager's powers are "subject in all cases to the limitations set forth in the Indenture"). And the Indentures, as discussed above, do not require the Trustee to bring RMBS litigations (or assign the authority to do so to the Issuers) absent instruction from the Noteholders. Moreover, the Trustee is not a party to the CMAs, which run between the Issuers and the Collateral Manager. Although the Trustee is given the express right to "enforce" the Collateral Manager's duties thereunder, *see* CMAs § 9, it does not have any corresponding obligations under that contract. Consequently, the Trustee's failure to comply with the Collateral Manager's December 5, 2018 letter cannot be a breach of § 2(d) of the CMAs.

### C.   Negligence

"Under New York law, to sustain a claim for negligence, plaintiffs must show that (1) defendants owed plaintiffs a cognizable duty of care; (2) defendants breached that duty; and (3) plaintiffs suffered damage as a proximate result of the breach." *Triaxx II*, 2018 WL 1417850, at *4 (citing *Di Benedetto v. Pan Am World Serv., Inc.*, 359 F.3d 627, 630 (2d Cir. 2004)). U.S. Bank contends that plaintiffs "cannot allege these elements," Def. Mem. at 20, because as a CDO Trustee it has no duties other than "those set out in the Indentures," *id.*, and even if it does, they are owed only to the Noteholders. *Id.* at 21. Defendant further argues that plaintiffs have not adequately alleged that U.S. Bank would "financially benefit" from its decision "not to pursue the RMBS Claims," *id.* at 22; that the claim is time-barred to the extent it is based on events that took place more than three years before this action was filed, *id.* at 19 n.7; and that, even if the negligence claim is otherwise properly pleaded, it is barred by the economic loss doctrine. *Id.* at 23.

Defendant's first argument fails. "The existence and scope of an alleged tortfeasor's duty is, in the first instance, a legal question for determination by the courts." *Triaxx II*, 2018 WL 1417850, at *5 (quoting *Sanchez v. State of New York*, 99 N.Y.2d 247, 252, 784 N.E.2d 675

(2002)). Under New York law, an indenture or "securitization" trustee (that is, a CDO or RMBS trustee) is generally "required to do only what the governing agreements prescribe," *IKB Int'l*, 40 N.Y.3d at 285, 220 N.E.3d at 652; however, the law also imposes two extra-contractual duties on the trustee: "a duty to avoid conflicts of interest and a duty to perform ministerial tasks with due care." *Id*.; *accord Nat'l Credit Union Admin. Bd. v. Deutsche Bank Nat'l Tr. Co.*, 410 F. Supp. 3d 662, 689 (S.D.N.Y. 2019); *Royal Park Invs. SA/NV v. HSBC Bank USA, Nat. Ass'n*, 109 F. Supp. 3d 587, 597 (S.D.N.Y. 2015); *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 191 (S.D.N.Y. 2011). Claims for breach of the duty to avoid conflicts "are properly pled as negligence claims, not as breaches of any fiduciary duty." *Nat'l Credit Union Admin. Bd.,* 410 F. Supp. 3d at 689.

Defendant's second argument is sound. A negligence plaintiff must show that the defendant owed a duty to *it*, not to non-parties capable of enforcing their own rights. *See, e.g.*, *Triaxx II*, 2018 WL 1417850, at *5 (the Issuers' "failure to plead the existence of a duty owed by defendants *to plaintiffs* must result in the dismissal of these claims."); *Pasternack v. Lab'y Corp. of Am.*, 892 F. Supp. 2d 540, 552 (S.D.N.Y. 2012) ("A plaintiff must show . . . a specific duty owed to the plaintiff.") (citation omitted). While it is clear under New York law that an indenture trustee owes limited extracontractual duties "to bondholders," *Ellington Credit Fund*, 837 F. Supp. 2d at 191, plaintiffs point to no authority holding that such a trustee owes comparable duties to issuers or collateral managers. Nor, for that matter, have plaintiffs explained how they – as opposed to the CDO Noteholders – are harmed by U.S. Bank's alleged negligence, which caused "damages to the value of the CDO Notes." Compl. ¶ 122. Plaintiffs do not own any CDO Notes. The Court therefore concludes (without reaching defendant's remaining arguments) that plaintiffs have failed to state a cognizable claim for negligence against the CDO Trustee.

The Court further concludes that the negligence claim is "duplicative of the breach of contract claim[]." *IKB Int'l*, 40 N.Y.3d at 290, 220 N.E.3d at 656.[22] In determining whether claims are duplicative, courts "evaluate[] the nature of the injury, how the injury occurred and the harm it caused." *Id*. at 290-91, 220 N.E.3d at 656. Even where the plaintiff has pleaded a legal duty independent of the contact, its tort claims should be dismissed if they are based on the same misconduct, and seek the same damages, for the same injury, allegedly caused by the breach of contract. *Id*. at 291-92, 220 N.E.3d at 656-57; *see also Bd. of Managers of St. Tropez Condo. v. JMA Consultants, Inc.*, 191 A.D.3d 402, 402-03, 137 N.Y.S.3d 692 (1st Dep't 2021) (dismissing negligence claim as duplicative of contract claim where both claims "allege the same underlying facts and seek the same damages"). A tort claim may be dismissed as duplicative even if the corresponding contract claim has been rejected "at the same procedural stage." *IKB Int'l*, 40 N.Y.3d at 291 n.3, 220 N.E.3d at 656 n.3.

The plaintiffs in *IKB Int'l* were RMBS investors, suing RMBS trustees on various contract and tort theories, including a negligence claim alleging breach of the duty to avoid conflicts. The Court of Appeals first held that plaintiffs' contract claims should be dismissed, because the RMBS trustees did not have an affirmative contractual duty to "enforce repurchase rights" against the sellers of the allegedly nonconforming mortgage loans collateralizing the RMBS. *Id*. at 289, 220

---

[22] According to the New York Court of Appeals, many recent state and federal decisions in RMBS cases (including *Triaxx II*) mistakenly "invoke[d] the 'economic loss doctrine' when determining whether tort claims are maintainable alongside breach of contract claims," conflating it with "the prohibition against duplicative contract and tort claims." *IKB Int'l*, 40 N.Y.3d at 290, 220 N.E.3d at 655. The Court of Appeals clarified that New York's "economic loss" rule "stands for the proposition that an end-purchaser of a product is limited to contract remedies and may not seek damages in tort for economic loss against a manufacturer, and does not have application beyond the products liability context." *Id*. (internal quotation marks and citation omitted). Notably, the Court of Appeals did not critique the result in *Triaxx II* (or any of the other RMBS cases it cited); it simply noted that these courts used the wrong label for their analyses.

N.E.3d at 655. It then held that plaintiffs' negligence claim should also be dismissed – as duplicative – because it was premised on the same conduct that allegedly breached the contract ("failing to enforce the Sellers' obligation to repurchase, substitute, or cure the defective mortgage loans") and relied on the same theory of injury and damages (that defendants' misconduct "diminished the value of the assets owned by the Trusts" and "diminished the principal and interest payments generated by those assets"). *Id*. at 291-92, 220 N.E.3d at 656-57. The link between the two claims, the court noted, was plaintiffs' allegation that the RMBS trustees "breached their contractual duties *because of* conflicts of interest." *Id*. at 291, 220 N.E. at 656 (emphasis in original).

The same is true here. The theory of plaintiffs' contract claim is that "[i]n refusing to pursue, accept direction with respect to, or assign authority to the [Issuers] to pursue the Actions and other claims relating to the Collateral for the CDO Notes, U.S. Bank breached its duties under the Agreements[.]" Compl. ¶ 98. The theory of their negligence claim is identical: that "[i]n refusing to pursue, accept direction with respect to, or assign authority to the [Issuers] to pursue the Actions and other claims relating to the Collateral for the CDO Notes, U.S. Bank . . . violated its legal obligation to avoid its irreconcilable conflict of interest." *Id*. Not only is the same misconduct alleged to constitute both the breach of contract and the breach of duty; the same injury is alleged under both theories: loss of the monies that would have been recovered in the Actions, which damaged "the value of the CDO Notes." *Id*. ¶¶ 113, 122. Thus, both claims "allege the same underlying facts and seek the same damages." *JMA Consultants*, 191 A.D.3d at 402-03, 137 N.Y.S.3d at 692. Moreover, as in *IKB Int'l*, 30 N.Y. 3d at 291, 220 N.E. at 656, plaintiffs here clearly allege "that defendant[] breached [its] contractual duties *because of* conflicts of interest." *See* Compl. ¶ 32 (alleging that U.S. Bank failed to discharge its contractual duties because

"bringing or pursuing, or assigning authority to bring or pursue, the Actions would have conflicted with U.S. Bank's interests"). Consequently, plaintiffs' negligence claim against the CDO Trustee, even if otherwise well-pleaded, would be subject to dismissal as duplicative of their contract claim.

## III.   CONCLUSION

For the foregoing reasons, defendant's motion to dismiss is GRANTED.

Plaintiffs do not seek leave to amend, and have not suggested – either in their brief or at oral argument – that they could cure any of the defects discussed above by repleading. *See* Tr. at 26:16-22. Consequently, the Clerk of Court is respectfully directed to terminate the motion at Dkt. 16, enter judgment for defendant, and close the case.

Dated: New York, New York
      March 31, 2024                 **SO ORDERED.**

_____
**BARBARA MOSES**
**United States Magistrate Judge**